CITY OF DAYTON, Appellee,

v.

COMBS et al., Appellants.

[Cite as *Dayton v. Combs* (1993), 94 Ohio App.3d 291.]

Court of Appeals of Ohio,
Montgomery County.

Nos. 13621 and 13622.

Decided June 9, 1993.

*Raymond L. Bilott,* Dayton Assistant Prosecutor, for appellee.

*Michael F. O'Loughlin* and *Theodore G. Gudorf,* for appellants.

WOLFF, Judge.

On June 19, 1992, Dianna C. Wagner was convicted of operating a gambling house in violation of Section 132.04(A)(1) of the Revised Code of General Ordinances of the City of Dayton (hereinafter referred to as "R.C.G.O."), and Kenneth D. Combs was convicted of gambling in violation of Section 132.03(A)(2) of the R.C.G.O. Wagner and Combs appeal from their convictions.

The evidence introduced by the city at trial is essentially as follows.

On January 7, 1992, Dayton police officers were dispatched to 2640 St. Charles Avenue after receiving an anonymous telephone call that there was a gambling operation at that location. When the officers arrived, they knocked on the door and were greeted by Combs, who slammed the door shut, apparently upon noticing that they were police officers. The officers then knocked on another door to the premises and were greeted by Wagner, who asked if she could help them. The officers then stated the purpose of their visit, and asked if they could come in and look around. Wagner consented and the officers entered the premises.

Once inside, the officers noticed Combs running from one room to another where people were playing various games of chance. The police officers observed that there were gambling tables set up at the end of a hallway and in several of the rooms adjoining the hallway. They further observed Combs dealing cards to people sitting across from him at a table and that there were poker chips on the table. In the outside hallway, the officers discovered a surveillance camera behind a two-way mirror situated so that persons approaching the front door

could be observed.   Finally, the officers noticed an elderly gentleman sitting at one of the tables pick up all of the poker chips in front of him, put them into his pocket, and walk toward the front door.

Based on this evidence, the officers obtained a search warrant and presented it to Wagner.   A more thorough search of the premises revealed that the gambling tables were for blackjack, baccarat, and poker, and that there were several decks of cards, several thousand poker chips, and "a couple of thousand dollars in cash" on the premises.

The officers then read Wagner and Combs the *Miranda* warnings, and asked them questions regarding the business operation.   Wagner told the officers that she was the manager and hostess of the establishment, that the establishment was called the "V.I.P. Travel Club" (hereinafter referred to as the "Club"), and that the purpose of the Club was simply to teach gambling techniques to amateur gamblers prior to preparing trips for them to various cities where gambling is allowed.   Wagner further stated that the Club did not charge any fee for its services, but she could not explain how the Club stayed in business.   Wagner did not provide, and the officers did not discover, any pamphlets or other paperwork to indicate that the Club had planned any trips for its patrons.

The officers then took witness statements from two of the patrons.   Approximately a week later, officers again approached these two witnesses to obtain a second statement.

On January 10, 1992, Wagner was charged with operating a gambling house in violation of R.C.G.O. 132.04(A)(1), and on January 24, 1992, Combs was charged with gambling, in violation of R.C.G.O. 132.03(A)(2).   A motion was made to consolidate the cases, and the consolidated case was tried to the Dayton Municipal Court on May 19, 1992.   The trial court found both Wagner and Combs guilty of the charges alleged.

Wagner and Combs appeal from this judgment and assert two assignments of error:

"I.   The trial court committed reversible error when it (1) permitted the witnesses to read their prior unsworn written witness statements, (2) permitted the prosecutor to elicit testimony concerning the content of the statements, and (3) admitted the statements."

In this assignment of error, Combs and Wagner assert that the trial court erred in (1) permitting the city to elicit testimony as to the contents of prior unsworn written witness statements by requesting that the witnesses read their statements and then questioning them as to the information contained therein, and (2) admitting these statements as substantive evidence.   Specifically, Combs and Wagner argue that these statements could not be used during witness

questioning or admitted into evidence because they constituted inadmissible hearsay.

We begin our analysis by noting that although Combs and Wagner combine their arguments as to the impermissibility of utilizing prior witness statements during trial testimony, and the impermissibility of admitting such statements into evidence, the two issues are in fact distinct and we will consider them as such.

### A. Utilizing Prior Witness Statements During Trial Testimony

Prior written statements may be utilized during trial testimony to either "refresh" a witness's recollection of events or information of which the witness has no present recollection at trial, or to impeach the testimony of a witness that is inconsistent with his prior statement. Use of such statements during trial testimony is permitted in the first instance to "jog" the memory of the witness, and in the second instance to indicate that the witness is untrustworthy. If used solely to refresh recollection or to impeach, the prior statement is of no substantive evidentiary value, and the hearsay rule and its exceptions are not implicated. If the statement is used to establish the truth of the matter asserted, *i.e.*, as substantive evidence, with or without an additional purpose to impeach, the hearsay rule and its exceptions are implicated.

With this foundation in mind, we now consider Wagner and Combs' contention that the trial court erroneously permitted two witnesses to read their prior written witness statements and erroneously allowed the city to elicit testimony as to the contents of these statements.

In order to determine the propriety of the trial court's apparent decisions on these issues, we must examine the entire testimony of the two witnesses involved. (Throughout the trial, the trial judge frequently declined to put his reasoning for his evidentiary rulings on the record.) The witness statements objected to are the statements of Edward Haller and James Weser, two of the patrons of the Club, who were both called to testify during the city's case in chief. At trial, Haller initially refused to answer any questions on the basis of the Fifth Amendment but agreed to testify after the trial court granted him immunity from prosecution for gambling. Nevertheless, Haller was hardly cooperative in his answers. When asked whether he had ever been to the Club, Haller answered, "I guess, I don't know." He also could not recall how long he had been a member of the Club or whether he had given any money to anyone at the Club. He did not recognize either of his signed statements, but acknowledged that the signatures contained on the statements were his. The city then quoted the specific questions asked in the statement and indicated what his answers had been. After reading each question and answer, the city asked Haller if he remembered that particular question and answer. In each case, Haller would respond, in

essence, that he might have said what the statement indicated, but that he did not know because he was "so shook up" he would have "said anything."

The format of Weser's testimony was much the same. Weser testified that he "believe[d]" that he was at the Club when the police raided the premises. He stated that he "thought" that he was playing cards, but that he had been drinking all day and was "not real positive." He was unsure as to whether he had been gambling, but stated that he "could have been gambling." When confronted with his prior witness statements, Weser identified his signature and acknowledged that the statements were his. When questioned as to particular answers he had provided in his prior statements, Weser more than once deferred to the information provided in the statements. Weser further testified that he thought the statements "could be right" and that although he did not know whether he had lost money, he stated that "when [he] was talking to the police officers, they were asking [him] those things, and to the best of [his] ability, [he] answered them."

Thus, the testimony of both Haller and Weser indicated that neither could adequately recall, or was inclined to recall, the events which took place at the Club on the night of the police raid. Accordingly, the city attempted to obtain testimony as to the relevant events by use of the witnesses' prior written statements. The record is devoid of any indication as to whether the city intended to "refresh" the recollection of these witnesses or to impeach their credibility by use of their statements, and thus we must determine whether the questioning as to these statements was permitted for either purpose.

### i.  Writings Used to Refresh Memory

The practice of "refreshing" a witness's recollection by means of a writing is prescribed by Evid.R. 612, which states:

" * * * if a witness uses a writing to refresh his memory for the purpose of testifying, either: (1) while testifying; or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing. He is also entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. * * * "

■ Prior to employing a writing to refresh the recollection of a witness, it must be established that the witness lacks a present recollection of the information or events described in the writing. The propriety of the form of the questions employed to establish this lack of present recollection is largely within the discretion of the trial court. Once the trial court is satisfied that the witness has no present recollection of the relevant information or events, the witness is permitted to read the writing silently or have relevant portions thereof read to

him. See *State v. Doherty* (1978), 56 Ohio App.2d 112, 10 O.O.3d 133, 381 N.E.2d 960; *State v. Stearns* (1982), 7 Ohio App.3d 11, 7 OBR 12, 454 N.E.2d 139; *State v. Woods* (1988), 48 Ohio App.3d 1, 548 N.E.2d 954. If his recollection has been revived, he may then continue with his testimony. The writing used to refresh the witness's recollection is not admitted into evidence unless admission is requested by the adverse party, and in any event has no substantive evidentiary significance. Such writings may not be used to circumvent Evid.R. 607's limitations on the impeachment of witnesses. See Giannelli, Ohio Evidence Manual (1988) 71, Section 612.03.

In this case, there is no doubt that the trial court was satisfied that both Haller and Weser lacked a present recollection of the events which took place on the night of the police raid. In fact, at one point during Weser's testimony, the trial court sustained an objection on the basis that Weser had testified that he did not recollect these events. Having determined that the witnesses lacked a present recollection of the relevant events, the trial court properly permitted the city to ask both witnesses to read their statements silently. However, rather than asking Haller and Weser if they could remember any of the relevant events after having read their statements and asking them to testify as to their refreshed recollections, the city immediately proceeded to question the witnesses as to the specifics of their witness statements. In essence, the city read the statements verbatim to the witnesses and asked repeatedly if they remembered making those statements.

As the witnesses had read their statements silently, it was not necessary for the city to read the statement aloud in order to attempt to refresh their recollections. Furthermore, the manner in which the city read the statements was more indicative of impeachment techniques than of those employed to refresh a witness's recollection, and as such violated the purpose of Evid.R. 612. Thus, the trial court should not have permitted the city to question the witnesses as to their prior witness statements in the manner it did.

Thus, although the trial court correctly permitted the witnesses to read their prior witness statements, pursuant to Evid.R. 612, as a means of refreshing their recollections of the events relevant to their testimony, the trial court could not have properly permitted, under the auspices of Evid.R. 612, the city to impeach the witnesses by use of their statements. That is not to say, however, that the trial court could not have properly permitted this type of impeachment by the city pursuant to Evid.R. 613 and 607.

*ii. Prior Statements of A Witness Used For Purpose of Impeachment*

Evid.R. 613 and 607 control the use of prior witness statements to impeach the credibility of a witness by the party calling the witness. These rules state in pertinent part:

"RULE 613. Prior Statements of Witnesses

"(A) Examining Witness Concerning Prior Statement. In examining a witness concerning a prior statement made by him, whether written or not, the statement need not be shown nor its contents disclosed to him at that time, but on request the same shall be shown or disclosed to opposing counsel."

"RULE 607. WHO MAY IMPEACH

"The credibility of a witness may be attacked by any party *except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Rules 801(D)(1)(a), 801(D)(2), or 803.*" (Emphasis added.)

Thus, the trial court could only have properly determined that the city was permitted to impeach Haller's and Weser's credibility by means of their prior witness statements if (1) the city was "surprised" as to the content of their testimony and was "affirmatively damaged" by that testimony, or (2) if the statements were properly admitted pursuant to Evid.R. 801(D)(1)(a), 801(D)(2), or 803, *i.e.*, as substantive evidence.

Surprise can be shown if the testimony is materially inconsistent with the prior written or oral statements and counsel did not have reason to believe that the witness would recant when called to testify. See *Stearns, supra; State v. Reed* (1981), 65 Ohio St.2d 117, 19 O.O.3d 311, 418 N.E.2d 1359; *Ferguson Realtors v. Butts* (1987), 37 Ohio App.3d 30, 523 N.E.2d 534; *State v. Blair* (1986), 34 Ohio App.3d 6, 516 N.E.2d 240; *State v. Moore* (1991), 74 Ohio App.3d 334, 598 N.E.2d 1224; *State v. Cantlebarry* (1990), 69 Ohio App.3d 216, 590 N.E.2d 342. The question of surprise is entrusted to the discretion of the trial court. *Ferguson, supra.* "Affirmative damage" can be established only if the witness testifies to facts which contradict, deny, or harm the calling party's trial position. *Stearns, supra; Ferguson, supra.* "Affirmative damage" is not shown where the witness denies knowledge of the facts contained in his prior statement or where he states that he does not remember the facts stated therein. See Staff Note accompanying Evid.R. 607; *Stearns, supra,* 7 Ohio App.3d at 15, 7 OBR at 16–17, 454 N.E.2d at 143–144.

In this case, it is clear that the city was surprised by the basically nonexistent testimony of Haller and Weser. However, neither of these witnesses testified to any *facts* which contradicted, denied, or harmed the city's trial position. Haller and Weser merely testified that they could not remember the events which took place the night of the police raid. This testimony is not sufficient to establish that the city was "affirmatively damaged" for the purposes of impeaching its own witnesses.

Thus, as the city could not establish affirmative damage as a result of either Haller's or Weser's testimony, the trial court could only have permitted the city to impeach these witnesses by their prior written witness statements if those statements were excluded from the "affirmative damage" requirement of Evid.R. 607 by virtue of their qualifying as substantive evidence under Evid.R. 801(D)(1)(a), 801(D)(2), or 803.

Evid.R. 801(D)(1)(a) controls the admission of statements which were testified to at a trial or hearing, given under oath, and subject to cross-examination, and Evid.R. 801(D)(2) controls the admission of statements by a party-opponent. These rules do not pertain to the witness statements in this case and, therefore, we need only consider whether the statements could be properly admitted under Evid.R. 803.

"Hearsay" is defined by Evid.R. 801(C) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 802 prohibits the admission of hearsay except as otherwise provided by, *inter alia*, the Rules of Evidence. Evid.R. 803 is one such rule which permits the admission of certain hearsay statements even though the declarant is available as a witness. Pertinent to this case is Evid.R. 803(5), which states as follows:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

" * * *

"(5) *Recorded Recollection.* A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown by the testimony of the witness to have been made or adopted when the matter was fresh in his memory and to reflect that knowledge correctly. *If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.*" (Emphasis added.)

Thus, in order to admit a statement into evidence, *i.e.*, read it into evidence, on the basis of Evid.R. 803(5), a party must establish that (1) the witness has a lack of present recollection of the recorded matter; (2) the recorded recollection was made at a time when the matter was fresh in the witness's memory; (3) the recorded recollection was made or adopted by the witness; and (4) the recorded recollection correctly reflects the prior knowledge of the witness. See 1 Weissenberger, Ohio Evidence (1993) 57, Section 803.58.

As stated previously, both Haller and Weser testified that they lacked a present recollection of the information described in their statements. The testimony established that the first set of statements was drafted on the night of

the raid and the second set of statements was drafted approximately one week later. Therefore, both sets of statements were made at times when the matter was fresh in the witnesses' memories. Further, both Haller and Weser acknowledged that the statements presented at trial contained their signatures and must therefore have been made by them. Therefore, three of the four foundational requirements for admission of hearsay evidence under Evid.R. 803(5) were established for both Haller's and Weser's witness statements. However, the fourth requirement, *i.e.*, that the recorded recollection correctly reflects the prior knowledge of the witness, is more problematic.

The fourth requirement for admitting hearsay statements under Evid.R. 803(5) is satisfied "where the witness has a present recollection of making the statement (though not of the underlying facts) and can testify that he took care to insure the accuracy of the recorded statement. * * * [W]here the witness cannot recall the preparation of the record and can testify only that he would not have signed or prepared the memorandum had he not believed it to be a true and accurate account of the event in question[,] * * * [m]ost commentators advocate admitting the statement, despite the fact that the foundation is nothing more than a general assertion of honesty which sheds little light on accuracy." (Footnote omitted.) 1 Weissenberger, *supra*, at 59, Section 803.60.

Neither of the witnesses in this case could testify that he remembered making the statements or that he took care to ensure the accuracy of his statement. Haller testified that not only he could not remember signing the statements, but also that he would have signed anything to get out of the Club. Therefore, we would conclude that Haller's testimony does not establish the accuracy of his statements, and thus fails to establish the fourth requirement for admitting recorded recollections as substantive evidence pursuant to Evid.R. 803(5).

Weser's testimony, on the other hand, does establish the accuracy of his first statement and permitted the admission of that statement as substantive evidence pursuant to Evid.R. 803(5). At trial, Weser testified that although he did not remember signing a statement the night of the police raid, he assumed that he had done so because his signature was on the statement. He further testified that if the statement indicated that he had purchased chips for money, he probably did so. Finally, he stated that he thought the statement could be right and that he had answered the questions to the best of his ability.

This testimony, albeit not a perfect foundation for the accuracy of Weser's first statement, contained sufficient indicia of the statement's trustworthiness to meet the fourth requirement for admission pursuant to Evid.R. 803(5). Thus, this statement could have been read into evidence and could have been used by the city to impeach its own witness pursuant to Evid. 613 and 607 without a showing of surprise and affirmative damage.

Such is not the case for Weser's second statement obtained by the police a week after the raid. Weser's testimony as to this statement indicates that he felt compelled to reiterate in the second statement the events described in the first statement for fear that he would lose his job if he did not do so. This testimony did not establish the accuracy of Weser's second statement and therefore did not meet the fourth requirement for admission under Evid.R. 803(5). Accordingly, the second statement could not have been used to impeach Weser at trial.

In sum, we conclude that the city's questioning of Haller and Weser, its own witnesses, at trial was indicative of impeachment, and as to Haller was impermissible under Evid.R. 612, 613, and 607. As to Weser, the city's questions relating to his second witness statement were likewise impermissible under Evid.R. 612, 613, and 607. However, the questions relating to Weser's first witness statement were permissible under Evid.R. 613 and 607.

### B. *Admissibility of the Prior Witness Statements for Their Substance*

We turn now to consider Wagner and Comb's contention that the trial court erred in admitting the statements of Haller and Weser as substantive evidence.

■ All parties agree that these witness statements are hearsay statements and as such are generally excluded from admission as substantive evidence pursuant to Evid.R. 802. However, the city contends that the statements are admissible under the hearsay exceptions contained in Evid.R. 803(5) and 804(B)(3). Having determined the admissibility of these statements under Evid.R. 803(5) in connection with the first part of this assignment of error, we need only consider whether either witness's statements were properly admitted for their substance under Evid.R. 804(B)(3).

Evid.R. 804(B)(3) controls the admission of statements against interest made by declarants who are unavailable to testify at trial and states in pertinent part:

"(B) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

" * * *

"(3) *Statement Against Interest.* A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject [him] to civil or criminal liability, or to render invalid a claim by [him] against another, that a reasonable person in [his] position would not have made the statement unless [he] believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the truthworthiness of the statement."

Evid.R. 804(A) defines "unavailability" in pertinent part as:

" 'Unavailability as a witness' includes situations in which the declarant:

" * * *

"(3) testifies to a lack of memory of the subject matter of [his] statement[.]"

As we determined *supra*, both Haller and Weser testified as to a lack of memory of the subject matter of their statements, and therefore both of these witnesses could be considered "unavailable" pursuant to Evid.R. 804(A)(3). Since both Haller and Weser were unavailable at the time of their testimony, their witness statements may be admitted as substantive evidence pursuant to Evid.R. 804(B)(3) if the following three criteria are met:

1. the declarant must have had firsthand knowledge of the events described in his statement,

2. the nature of the statement made was such that a "reasonable man" would not have uttered it had he not believed it to be true, and

3. the statement must be contrary to a pecuniary, proprietary, or penal interest at the time of its utterance.

If the statement affects a penal interest, Evid.R. 804(B)(3) requires that some corroborating evidence must be admitted to clearly indicate the trustworthiness of the statement. Such corroboration need not *verify* the matters asserted in the statement; it need only directly or circumstantially *tend* to establish the matters asserted. See Weissenberger, *supra*, at 186–187, Section 804.53. "[T]he rule contemplates a demonstration of corroborating circumstances (concerning the content of the statement and the conditions under which it was made) which, on balance, persuade the trial judge that the statement bears the clear indicia of reliability and trustworthiness, * * * " *State v. Saunders* (1984), 23 Ohio App.3d 69, 73, 23 OBR 132, 137, 491 N.E.2d 313, 319. The decision to admit a statement against interest rests within the sound discretion of the trial judge and the standard for appellate review is whether the judge abused that discretion. *State v. Smith* (Sept. 1, 1987), Montgomery App. No. 9963, unreported, 1987 WL 16571.

Both Haller and Weser clearly had firsthand, or personal, knowledge of the matters asserted in their statements because their statements merely described their experiences at, and opinions of, the Club. Therefore, the first criterion for admission under Evid.R. 804(B)(3) is satisfied. Likewise, it is clear that both Haller's and Weser's statements were against their penal interest in that they admitted that the two were engaged in illegal gambling activities for which they could be criminally charged. Thus, the third criterion is also established for both Haller and Weser.

The second criterion for admission under Evid.R. 804(B)(3), *i.e.*, the nature of the statement must have been such that a reasonable man would not have uttered it unless he believed it to be true, is not as readily apparent. Basically, this criterion is whether "the declarant knew and understood the ramifications of his statement in terms of an *objective* test: would a 'reasonable man *in his position*' have made the statement if it were not true." Weissenberger, *supra*, at 182, Section 804.50. Thus, in determining whether a statement should be admitted under Evid.R. 804(B)(3), a trial court should "attribute to the declarant motives normally affecting a reasonable person in similar circumstances." *Id.* at 183, Section 804.50.

From Haller's testimony, it appears that the police raid may have been frightening to the members of the Club who were present. Haller said he was "shook up," and Weser said he was inebriated. However, the determination of whether their witness statements are admissible under Evid.R. 804(B)(3) does not involve an examination of their subjective motives in making the statements to the police. Rather, the determination of admissibility in this case involved an objective determination of the motives of persons in their situations. Specifically, the question is whether a reasonable person present at the Club during the police raid would have been so frightened that that person would have signed statements inculpating himself in illegal gambling activities, thereby risking prosecution, if in fact he did not believe his statements to be true.

If either Haller or Weser did not believe that he was gambling at the Club or that he lost or won money to the dealer of the Club, it seems objectively unlikely that he would have said that he had. Frightened or not, if either Haller or Weser believed that he was merely learning how to gamble proficiently, he could have easily said so in his statement, and by doing so he might have avoided prosecution for illegal gambling activities. Thus, the trial court could have reasonably concluded that a reasonable person in Haller's and Weser's circumstances would not have made the statements they did if he did not believe them to be true. Therefore, the second criterion for admitting their witness statements under Evid.R. 804(B)(3) could have reasonably been determined to have been established.

Having determined that the three criteria for admitting Haller's and Weser's witness statements could have reasonably been found to have been established, and that the statements affected a penal interest, we may only conclude that the trial court properly admitted these statements as substantive evidence under Evid.R. 804(B)(3) if the record includes corroborating circumstances which clearly indicate the trustworthiness of the statements. We find that it does. For example, the events and items described in both Haller's and Weser's statements were consistent with the discovery of poker chips, decks of cards, large amounts

of cash, and other gambling paraphernalia at the Club. Further, both Haller's and Weser's statements regarding the fact that the chips had monetary value were substantiated by the testimony of several police officers, stating that they observed a gentlemen collect his chips from the table and attempt to take them with him as he left the premises.

Accordingly, we conclude that the trial court did not abuse its discretion in admitting both Haller's and Weser's statements as substantive evidence under Evid.R. 804(B)(3).

■ Moreover, we conclude that the errors committed when the trial court permitted the city to impeach Haller with either of his witness statements and Weser with his second witness statements constitute harmless error in light of our determination that the statements were ultimately admissible as substantive evidence under Evid.R. 804(B)(3).

The first assignment of error is overruled.

The second assignment of error provides:

"II. The decision of the trial court in finding appellants Combs and Wagner were guilty beyond a reasonable doubt of violating §§ 132.03(A)(2) and 132.-04(A)(1) of the Revised Codified Ordinances of the City of Dayton, respectively, was against the manifest weight of the evidence for the following reasons:

"A. The state [*sic*] failed to prove that on January 7, 1992, * * * the appellants established, promoted or operated or knowingly engaged in conduct which facilitated any scheme or game of change [*sic*].

"B. The state [*sic*] failed to prove that on January 7, 1992, * * * the appellants' alleged gambling was conducted for profit.

"C. The state [*sic*] failed to prove the appellant Wagner was the owner or lessee or had custody, control, or supervision of the premises in question."

■ A judgment of a trial court may not be reversed as being against the manifest weight of the evidence if the conviction is supported by some competent, credible evidence on each essential element. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. In this assignment of error, Wagner and Combs assert that their convictions are against the manifest weight of the evidence in that the city failed to establish three essential elements: (1) that they were engaged in a "scheme or game of chance"; (2) that their alleged conduct was conducted for profit; and (3) that Wagner was the owner, lessee, or had control of the premises. We will consider each of these allegations in the order presented.

R.C.G.O. 132.03(A)(2), under which Combs was convicted, states in pertinent part:

"(A) No person shall:

" * * *

"(2) Establish, promote, or operate, or knowingly engage in conduct which facilitates any scheme or game of chance conducted for profit[.]"

R.C.G.O. 132.04(A)(1), under which Wagner was convicted, states:

"(A) No person, being the owner or lessee, or having custody, control, or supervision of premises, shall:

"(1) Use or occupy such premises for gambling in violation of § 132.03."

In support of their contention that their convictions were against the manifest weight of the evidence, Wagner and Combs first assert that the city failed to establish that they were engaged in conduct which facilitated any game of chance. Specifically, Wagner and Combs contend that, assuming that Haller's and Weser's witness statements were inadmissible, there is no evidence that a game of chance was being played at the Club on the night of the police raid.

R.C. 2915.01(D) defines a "game of chance" as follows:

"(D) 'Game of chance' means poker, craps, roulette, a slot machine, a punch board, or other game in which a player gives anything of value in the hope of gain, the outcome of which is determined largely or wholly by chance."

Thus, in order to prove that Wagner and Combs were engaged in a "game of chance," the city was required to establish that they were involved in any of the above-enumerated games or any other game whose outcome is determined largely by chance and for which players give something of value in the hopes of gain. The evidence presented to establish this element included the four witness statements, which we have determined were properly admitted by the trial court, the testimony of several police officers, and the testimony of a member of the Club. The witness statements established that both Haller and Weser purchased poker chips, played blackjack or twenty-one, and lost money. The police officers testified that they observed gambling paraphernalia and persons dealing and playing cards. Finally, a member of the Club testified that he exchanged money for chips and played blackjack.

From this evidence, we conclude that the city presented competent, credible evidence from which the trial court could properly determine that both Wagner and Combs were engaged in games of chance. Therefore, their convictions were not against the manifest weight of the evidence as to this element. See *State v. Young* (1983), 13 Ohio App.3d 91, 13 OBR 107, 468 N.E.2d 131 (holding that a person playing blackjack is playing a game of chance).

We turn now to Wagner and Combs' contention that their convictions were against the manifest weight of the evidence because R.C.G.O. 132.03(A)(2) prohibits only "scheme[s] or game[s] of chance conducted for profit" and no evidence was presented to establish that their alleged conduct was conducted for profit.

In support of their contention that the city failed to establish that they were engaged in a scheme or game of chance for profit, Wagner and Combs rely on the definition of "[s]cheme or game of chance conducted for profit" contained in R.C. 2915.01(E) and the general definition of "profit" enunciated by the Ohio Supreme Court in *State v. Posey* (1988), 40 Ohio St.3d 420, 534 N.E.2d 61. Such reliance is of no avail.

R.C.G.O. 132.01 expressly incorporates the definition of all words and phrases contained in R.C. 2915.01, and thus R.C. 2915.01(E)'s definition of "scheme or game of chance conducted for profit" is applicable to this case. R.C. 2915.01(E) defines this phrase as:

"any scheme or game of chance *designed to produce income* for the person who conducts or operates the scheme or game of chance[.]" (Emphasis added.)

The Ohio Supreme Court in *Posey, supra,* at 423, 534 N.E.2d at 62, defined "profit" as:

" 'Most commonly, the gross proceeds of a business transaction less the costs of the transaction; *i.e.* net proceeds. Excess of revenues over expenses for a transaction; sometimes used synonymously with net income for the period. Gain realized from business or investment over and above expenditures.' " Quoting Black's Law Dictionary (5 Ed.1979) 1090.

We see nothing in either of these definitions which requires that the city must establish, as Wagner and Combs suggest, that the Club's gross revenues exceeded its expenditures in order to prove that they violated R.C.G.O. 132.03(A)(2). R.C.G.O. 132.03(A)(2) requires the city to establish that the scheme or game of chance is *conducted* for profit, not that it is *profitable.* The definition of "[s]cheme or game of chance conducted for profit" requires that the scheme or game be *designed to produce income,* not that income be actually produced.

Furthermore, we are not dissuaded from this interpretation by the authority provided by Wagner and Combs. The cases cited do not hold, as Wagner and Combs indicate that they do, that actual profit must be established for any conviction under R.C.G.O. 132.03(A)(2). See *State v. VFW Post 3562* (1988), 37 Ohio St.3d 310, 525 N.E.2d 773 (holding that the absence of any evidence indicating that the defendant engaged in conduct facilitating any scheme or game of chance conducted for profit warranted reversal of the conviction); *Garono v. State* (1988), 37 Ohio St.3d 171, 524 N.E.2d 496 (holding that mere possession of a

gambling machine is not sufficient evidence of a violation of the gambling laws; there must be some evidence from which it can be inferred that the machines were being used for profit); *State v. Parker* (1948), 150 Ohio St. 22, 37 O.O. 318, 80 N.E.2d 490 (holding that an indictment for gambling pursuant to Section 13064, General Code, must allege that the defendant gambled "for his own profit"); *State v. Loom Lodge 1610 Port Clinton* (Mar. 31, 1987), Ottawa App. No. OT–86–37, unreported, 1987 WL 8934 (stating, without further elaboration, that the state failed to establish that profits were "yielded" from the machine and tickets); *State v. Wilson* (Apr. 5, 1984), Montgomery App. No. CA–8362 (holding that some proof of a "profit motive" or evidence "which tends to show any realization of profit" was necessary to sustain a conviction); *State v. Lemmon* (Oct. 23, 1978), Champaign App. Nos. 77CA19 and 77CA20 (holding that the state failed to establish that the sale of gambling paraphernalia, although profitable in itself, was designed to produce income to the seller from games that might be conducted by the purchasers of that paraphernalia); *State v. Polozzi* (1975), 44 Ohio Misc. 34, 73 O.O.2d 104, 336 N.E.2d 471 (holding that "conducted for profit" is a necessary element of a gambling violation, and not an affirmative defense to such a charge); *Posey, supra* (holding that a nonprofit organization may be convicted of gambling for profit to the extent that it profits from the operation of games of chance).

█ Accordingly, we hold that the city was not required to establish that the Club was profitable in order to comport with the elements of R.C.G.O. 132.-03(A)(2). Furthermore, we find that the evidence establishing that the Club members purchased chips from the dealer, returned their remaining chips to the dealer for reimbursement, and lost money to the Club, constituted competent, credible evidence that the Club was "conducted for profit" as required by the R.C.G.O.

█ We turn now to Wagner's contention that her conviction for a violation of R.C.G.O. 132.04(A)(1) was against the manifest weight of the evidence because the city failed to establish that she was the "owner or lessee, or ha[d] custody, control, or supervision of premises" which were used for gambling." Specifically, Wagner asserts that the city's evidence was insufficient to prove this element because the testimony established only that she was the front-door person, hostess, greeter, or soda server at the Club. We disagree with this characterization of the evidence.

Our review of the record indicates that there was competent, credible evidence from which it could be established that Wagner had custody, control, or supervision of the Club. For instance, several police officers testified that Wagner was the person in charge, that she accepted the search warrant, and that she described herself as the "manager slash hostess" of the Club. In addition, other

witnesses testified that they thought Wagner was "running" the Club and that she was in charge of opening and closing the premises.

Accordingly, we conclude that the trial court's decision convicting Wagner and Combs was not against the manifest weight of the evidence. The second assignment of error is overruled.

The judgment of the Dayton Municipal Court will be affirmed.

*Judgment affirmed.*

BROGAN and FAIN, JJ., concur.