Defendant-appellant, Traquez S. Cupe, appeals from a judgment of conviction and sentence of the Franklin County Court of Common Pleas finding him guilty of two counts of aggravated robbery with firearm specifications, two counts of kidnapping with firearm specifications, and two counts of robbery.
The charges arose out of a car-jacking and subsequent convenience store robbery perpetrated by a group of young men on the South side of Columbus on January 13, 1996. The general version of the facts alleged by the prosecution was that appellant, in the company of his three friends, Antonio Thompson, Nickolas Holmes, and Seunda Story, on the day in question approached the first victim, Paul Barnes, at gunpoint in his driveway and demanded the keys to his 1992 Chrysler. A short time later, appellant and his friends, armed with guns, entered the Home Market on Groveport Road, a short distance from the site of the car-jacking. Police responding to both the car-jacking and store robbery calls soon located the automobile in a nearby neighborhood, surrounded by appellant and his friends. Thompson and Story were arrested after a short foot chase, Holmes soon thereafter, and appellant sometime later based on information provided by the other suspects.
The first witness for the prosecution was the car-jacking victim, Paul Barnes. Barnes testified by agreement of the parties and due to his unavailability, through presentation of his prior sworn testimony, read to the jury by the court's staff attorney.
Barnes' testimony related that on the day in question, he was outside of his home shoveling snow from his driveway. As he walked towards his car to move it into a newly cleared area, an individual stuck a gun in his face and stated "let me have your car." Barnes attempted to walk away or avoid this individual, but another person came up and put a gun in his side and ordered Barnes to get down in the snow, which he did. The two assailants then drove off in Barnes' car, ordering him to stay in the snow and not move. As the car drove away, the two assailants were yelling to someone else "come on, get in," and Barnes heard two more car doors slam. Barnes surmised that at least two more persons had joined his two assailants in the car. Barnes testified that he got a good look at the two men who had confronted him in front of his house and that both were carrying small revolvers.
About twenty minutes after Barnes telephoned the police to report the car-jacking, the police came to take a report, and during this time, a call came in that the automobile had been found. Police took Barnes to identify the persons taken into custody at the location where the car was found. There were two people shown to him by police, but Barnes could only identify one because of the lighting. Barnes did not identify which of the four persons implicated in the crime he had identified at the scene, but it was apparently understood by both the defense and prosecution that it was not appellant, but rather one of the two individuals taken into custody at the scene after a short foot chase, Antonio Thompson or Seunda Story.
On cross-examination, Barnes testified that he saw only two people with guns, and thereafter was lying face down in the snow and could not see anyone until the car was driving off, at which point he thought he saw at least four persons in the car.
The prosecution then presented the testimony of Russell Weiner, an officer with the Columbus Division of Police. Officer Weiner testified that on the night of January 13, 1996, he was dispatched to a robbery at the Home Market located on Groveport Road near the viaduct over State Route 104. Officer Weiner had received information a few minutes earlier regarding the car-jacking of Barnes' car in the same vicinity. He then located a vehicle matching the description parked on a residential street about four hundred yards from the Home Market, with three individuals standing around the vehicle. All individuals fled on foot when Officer Weiner approached and after a short foot chase, Officer Weiner apprehended a suspect later identified as Seunda Story. One of the other persons fleeing, later identified as Antonio Thompson, was apprehended by Sergeant Paul Weiner of the Columbus Division of Police (Officer Russell Weiner's brother) who was also on the scene.
Sergeant Paul Weiner then testified for the prosecution and corroborated much of what Officer Russell Weiner had described, adding details regarding the chase and apprehension of Antonio Thompson. Sergeant Weiner further testified that he conducted an identification show-up after Thompson and Story were arrested, and that both Barnes and the clerk working at the Home Market at the time of the robbery had identified Thompson as a perpetrator in each case. Sergeant Weiner testified that he was subsequently present at an interview of Antonio Thompson by a Detective Lanning of the Columbus Division of Police. Sergeant Weiner's testimony describing this interview was that Thompson at that time gave Detective Lanning the names of appellant and Nickolas Holmes as the two men other than Thompson and Story who were involved in both the car-jacking and the robbery of the Home Market. Nickolas Holmes was promptly arrested based on this information, and Weiner was again present for the interview between Holmes and Detective Lanning. At this time, Sergeant Weiner testified, Holmes also gave Detective Lanning the name of appellant as the fourth person involved in the robberies.
The state then presented the testimony of Antonio Thompson. Based upon the transcript, it is apparent that Thompson's attitude throughout his testimony could only be described as contentious and uncooperative, and the prosecutor was compelled to adopt an aggressive line of questioning to extract any information at all from Thompson on the stand. Thompson testified that he had been boyhood friends with the other three alleged robbers, Story, Holmes, and appellant. He testified that he had entered a guilty plea to one count of aggravated robbery with a firearm specification, and was serving a nine to twenty-five year sentence as a result of a plea agreement with the state in exchange for his truthful testimony against his companions. The gist of Thompson's often confused and conflicting testimony was that he himself had participated in both the car-jacking and robbery along with Story and Holmes. Thompson was adamant throughout, however, that appellant was not present during the car-jacking of Barnes' vehicle. Thompson did concede that appellant was present during the robbery of the Home Market, and he identified Story, Holmes, and appellant as persons visible on a security camera videotape taken at the Home Market. Thompson dismissed his prior statements to police implicating appellant, stating that he had in fact not made any such statements, or that he could not clearly recall what he might have said because he was under the influence of marijuana and cocaine on the night he was arrested.
Nickolas Holmes also testified for the prosecution that he had entered a guilty plea to one count of aggravated robbery with a firearm specification and was also serving a nine to twenty-five year sentence resulting from the car-jacking and robbery. He also testified that he had grown up with Story, Thompson, and appellant. Holmes testified that on January 13, 1996, the four of them had been "hanging out" together smoking marijuana, when according to Holmes, Thompson, acting alone, "took a man's car." Holmes testified that he and the two others were on a different street, and that Thompson had driven around and picked them up after taking the car.
The prosecution then attempted to refresh Holmes' memory by giving him a transcript of previous sworn testimony, apparently from a prior hearing in the same matter. After being presented with this transcript, Holmes testified that all four were present at the time that Thompson had threatened Barnes with a gun, but that none of the others had pointed a gun at Barnes and their involvement was limited to getting in the car after Thompson had taken it. They then drove to the Home Market on Groveport Road, and, at Thompson's instigation, decided to rob it. The four of them afterward drove to a residential alley in their neighborhood, where they were eventually located by the police. Holmes testified that he eluded the police and spent the night at his girlfriend's home, and was subsequently arrested.
On cross-examination, counsel for appellant again sought to discredit Holmes, pointing out, as had been the case with Thompson, that Holmes had entered into a plea bargain which hinged upon his testimony against the other accuseds. Counsel for appellant confronted Holmes with his prior statements to counsel that appellant had not been involved in either the car-jacking or the robbery of the Home Market. Holmes stated that he had been lying at the time he talked to counsel and was now telling the truth.
The defense presented the testimony of Seunda Story, who testified that he himself was involved in the car-jacking and Home Market robbery, but the appellant was not involved in either. On cross-examination, Story denied ever telling the prosecutor in an interview that appellant had been involved in either robbery. Story likewise disavowed his prior statements to police implicating appellant. Story was the only witness for the defense, which rested its case.
The prosecution presented the testimony of attorney Pam Erdy in rebuttal to the testimony of Story. Erdy testified that she had represented Story in his defense against the charges leading to the plea bargain, and that Story had, in the presence of both Erdy and the prosecutor, made a statement implicating appellant in both robberies.
The jury returned a guilty verdict on all six counts. The court merged the kidnapping and robbery counts with their respective aggravated robbery counts, and sentenced appellant to terms of ten to twenty-five years on each aggravated robbery count, to be run consecutively. The court also imposed two three-year terms on the gun specifications, also to be served consecutively.
Appellant has timely appealed and brings the following assignments of error:
 1. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT ALLOWED THE PROSECUTOR TO TESTIFY TO FACTS BY WAY OF IMPEACHING HIS OWN WITNESS REGARDING A PRIOR STATEMENT OF SAID WITNESS, ALL OF WHICH WAS HEARSAY, CONTRA EVID. RULES 607, 612, 613, 801(C) AND 803(5), THEREBY DENYING THE DEFENDANT HIS RIGHT TO A FAIR TRIAL.
 "2. THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 "3. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO GIVE A LIMITING INSTRUCTION PURSUANT TO EVID. R. 105 REGARDING THE EVIDENCE RECEIVED AS TO WITNESSES LANNING AND ERDY.
 "4. DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED UNDER THE FIFTH, SIXTH
AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."
Appellant's first assignment of error asserts that the trial court committed plain error when it allowed the prosecution, when impeaching its own uncooperative witness, Antonio Thompson, to testify by way of wholesale introduction of the witness' prior statements into the record.
Because no objection was made at trial, the error asserted must be addressed under the plain error standard. A court should take notice of plain error only in exceptional circumstances when it is necessary to avoid a miscarriage of justice. State v. Wolery (1976), 46 Ohio St.2d 316. Plain error will give rise to reversal only when, but for the error, the outcome of the trial clearly would have been different. Statev. Long (1978), 53 Ohio St.2d 91. Otherwise stated, the standard of review for plain error is whether substantial rights of the accused are so adversely affected as to undermine the fairness of the guilt determination process. State v.Swanson (1984), 16 Ohio App.3d 375.
When the prosecution called Thompson as a witness, it was with the manifest belief that he would testify in accordance with both his prior statements upon being apprehended by police, and prior sworn statements in the case, in which he had placed appellant at both the scene of the car-jacking and the convenience store robbery. When questioned on the stand, however, Thompson was argumentative and uncooperative under direct examination. While he conceded that appellant had been present at the robbery of the Home Market, Thompson repeatedly denied that appellant had been present when Barnes' vehicle was taken at gunpoint. Based upon this denial, the prosecution began cross-examining its own witness and impeaching his testimony by referring to prior sworn statements:
 "Q. (By Mr. Stead) Where were you when you hooked up with Quez?
"A. I can't remember. I don't remember all that.
"Q. Was Quez present at the time you took the car?
"A. No.
 "Q. Sir, you have testified before under oath, have you not, at a prior hearing?
"A. Yes, I testified before.
 "Q. Is that what you said at a prior hearing under oath?
"A. No. I said I took the car.
 "Q. With respect to Mr. Cupe being present, is that what you testified to under oath before?
 "A. I don't remember about all that. I said I took the car. That's what I remember telling you.
"* * *
"Q. Do you recall testifying at a prior hearing?
"A. Yeah. You already asked me that once, yeah.
 "Q. Do you recall what you said at the prior hearing under oath?
"A. I don't recall what I said.
 "Q. Do you recall what you said when you testified under oath before?
"A. Yes. I just said yeah, I recall what I said.
 "Q. What did you say before under oath with respect to Mr. Cupe being present at the time the car was taken?
 "A. He wasn't there when the car was taken. I took the car. There were only three of us there at the time.
"Q. Okay. When did you hook up with Mr. Cupe?
"A. About an hour or so after I took the car.
"* * *
"Q. You're not happy about being here?
"A. No, I'm not happy about being here.
"Q. Why Not?
 "A. You know what I'm saying? It ain't nothing like I said last time. You know what I'm saying? Let him go. You know, we are doing our time. You got us doing our time. He didn't do nothing like I told you the last time.
"Q. Like you told —
"A. He was just there. He was just there.
 "Q. Do you recall the last time telling this court when you testified under oath that he was present at the time the car was taken?
 "A. I told you I took the car. Three of us were there. We took the car.
 "Q. Sir, do you recall telling this court under oath last time that Mr. Cupe was present when the car was taken?
 "A. I don't recall saying that. I don't remember saying that.
"* * *
 "Q. Do you recall testifying at a prior hearing under oath?
"A. What's that right there?
 "Q. Please just answer the questions. Do you recall testifying at a prior hearing under oath?
"A. Last year sometime.
 "Q. Okay. Do you recall what you said at that time under oath?
"A. No.
 "Q. Would it refresh your recollection to review the transcript of your testimony from that prior hearing under oath?
 "A. Do what you have to do, man. I don't remember saying that.
"* * *
 "Q. Does that refresh your recollection as to what you testified to?
"A. I didn't say that right there, no.
"* * *
"Q. You deny saying that?
"A. I didn't say all that.
 "Q. Okay. Does that refresh your recollection as to whether or not Mr. Cupe was with you at the time the car was taken?
 "A. He wasn't with us when the car was tooken. I took the car. You even told them — the man that the car was took from identified me as taking his car. You remember that?
 "Q. You recall being asked were you with anyone that night and giving the answer yep?
"Question, 'who were you with?'
"Answer, 'Nick, Seunda and Traquez.'
"You were asked by me 'Nick Holmes?'
" "Yep.
' "Traquez Cupe?
' "Yep.
' "Seunda Story?
" "Yes.'
 "Mr. Baker: If he's going to testify, he should be able to read it for himself to see if that is what he said.
 "The Court: You're right, he should be able to. But the witness is being less than cooperative. So I will allow it." (Tr. 95-98, 101-102, 120-123.)
The prosecution also made reference to unsworn statements made by Thompson after his arrest, when interviewed by Detective Lanning. Thompson implicated appellant in these statements as well.
Appellant argues that the use of the prior sworn and unsworn statements by the witness constituted improper impeachment of the prosecution's own witness in violation of Evid.R. 607, governing the use of prior inconsistent statements to impeach a party's own witness, and providing as follows:
 "The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Rules 801(D)(1)(A), 801(D)(2), or 803."
The requisite surprise can be established if the testimony is materially inconsistent with prior written or oral statements, and counsel for the party calling the witness did not have reason to believe that the witness would recant when called to testify. Dayton v. Combs (1993) 94 Ohio App.3d 291. Affirmative damage will be established only if the witness testifies to facts which contradict, deny, or otherwise harm the calling party's theory of the case or trial posture. Id.
Appellant argues that Combs stands for the proposition that a witness' failure to recall can never constitute affirmative damage. Even if we were to accept this broad interpretation ofCombs, it is not applicable to the facts before us. The transcript clearly reveals that Thompson was not only unable to recall the substantive facts about which he was expected to testify, regarding appellants participation in the car-jacking and convenience store robbery, but rather was insisting that he could not recall whether or not he had made the prior inconsistent statements with which his testimony was being impeached. This applied both to his prior sworn testimony and his interview with police Detective Lanning on the night of his arrest.
Regarding appellant's prior sworn testimony, which was introduced for impeachment purposes, the language of Evid.R. 607 provides that the requirement of surprise and affirmative damage does not apply to statements admitted pursuant to Evid.R. 801(D)(1)(a), which covers evidence in the form of prior sworn testimony:
 "(D) Statements Which Are Not Hearsay. A statement is not hearsay if:
 "(1) Prior Statement by Witness. The declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is (a) inconsistent with his testimony, and was given under oath subject to cross-examination by the party against whom the statement is offered and subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition * * *."
It was therefore not error for the trial court to allow use of the prior sworn statements, which were in fact not hearsay. As to the unsworn statements made to Detective Lanning, there was sufficient indication of surprise and affirmative damage in Thompson's conflicting testimony to warrant impeaching the witness. It is particularly significant that Thompson entered into his plea bargain with the state and received a significantly lesser sentence than he might have otherwise in the absence of cooperation. The prosecution manifestly expected when it called Thompson as a witness, that he would testify in accordance with his prior version of the facts which had won him a favorable plea bargain, and in fact Thompson appears to have done so when he testified under oath at a previous hearing in appellant's case. It was therefore not error for the trial court to permit the prosecution to impeach its own witness.
There remains, however, the issue of whether the trial court permitted excessive hearsay evidence in the course of the prosecution's impeachment of its own witness, in essence using the impeachment process to introduce otherwise inadmissible evidence for purposes beyond the scope of merely attacking the witness' credibility. The prosecution, in particular, beyond inviting Thompson to review his prior statements, was able, without objection, to play for the jury an entire videotape of Thompson's initial interview with Detective Lanning after his arrest. Thompson throughout his testimony refused to acknowledge or adopt either the written or videotaped version of this interview, and the statements he made therein inculpating appellant. The admission of the videotaped interview with Detective Lanning presents problems with respect to the hearsay rule, and with the scope of the use of the videotape to impeach Thompson's testimony, when he had in fact not adopted the videotape as his own prior statement. However, the statements in the videotape were largely cumulative to the prior sworn testimony of Thompson, which was not hearsay and was properly admitted for impeachment purposes. Under a plain error standard, therefore, we cannot conclude that the outcome of the trial would have been clearly different. Appellant's first assignment of error is accordingly overruled.
Appellant's second assignment of error asserts that the jury's verdict was against the manifest weight of the evidence or the result of insufficient evidence. The Supreme Court of Ohio in State v. Thompkins (1997), 78 Ohio St.3d 380, set forth the following standard for a court reviewing an appeal from a criminal conviction based upon a claim that the verdict is against the manifest weight of the evidence:
 ' "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." ' Id. at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
When reviewing on manifest weight of the evidence, we do not construe the evidence most strongly in favor of the state. Instead, we must engage in a limited weighing of the evidence to determine whether there is sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387, unreported (1993 Opinions 5437, 5438).
The Ohio Supreme Court has stated, however, that the legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different. "With respect to sufficiency of the evidence, ' "sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Blacks Law Dictionary (6th Ed. 1990) 1433. In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." Thompkins, at 386.
Paul Barnes testified that two young men, one of whom he identified as Antonio Thompson, confronted him with guns and forced him to lay face down in the snow. As they drove away, Thompson and his companion called out for someone else to "come on, get in." Barnes heard car doors slamming, and saw at least four men in the car as it drove away.
Nickolas Holmes testified that he, Thompson, Story and appellant were together on the day of the robbery. He identified appellant as participating in the car-jacking:
"Q. (By Ms. Schleub) What did Antonio do?
"A. He stuck the dude up for the car?
"Q. He stuck the dude up for the car"
"A. Yeah.
"* * *
 "Q. So Antonio went up first and put a gun on the man?
"A. Right.
"Q. And where were you other three at that point?
 "A. Just a few feet down from where it was happening.
 "Q. Were you outside of Seunda's girlfriend's car at that point?
"A. Yes. (Tr. 177-178.)
 "Q. And what did the three of you do after Antonio got the car?
"A. We jumped in the car.
"Q. All four of you?
"A. Yes.
 "Q. What happened after the four of you got in the car?
 "A. Just — I just drove to the store to get — to the store to get some beer and [stuff].
"Q. Did you drive to the store to get some beer?
"A. Yes.
"Q. Is this the store you guys ended up robbing?
"A. Yes."
The testimony of Nickolas Holmes thus placed appellant as a participant in both the car-jacking and robbery of the Home Market. Companionship with other known actors, before, during, and after a crime is probative, circumstantial evidence of intent to participate in the crime. State v. Pruett (1971),28 Ohio App.2d 29; State v. Kiraly (1977), 56 Ohio App.2d 37. Appellant does not seriously contend upon appeal that he was not an active participant in the Home Market robbery. Nickolas Holmes' testimony placed appellant at the scene of the car-jacking, which corresponded to Barnes' observation of additional participants in the car-jacking. The testimony of Holmes and Barnes, combined with the circumstantial evidence, was sufficient to support the jury's verdict. Although it was contradicted by the testimony of Story and Thompson on the issue of appellant's presence at the car-jacking, their testimony was effectively rebutted by use of prior sworn testimony in the case of Thompson and rebuttal testimony from Storys' attorney, who recounted his statement to police after arrest.
The weight to be given evidence at trial and the credibility of witnesses are matters primarily for the trier of fact.State v. DeHass (1967), 10 Ohio St.2d 230. A court of appeals must be guided by presumption that the findings of the trier of fact are correct; such deference is due because the trier of fact is best able to view the witness and observe demeanor, gestures, and voice inflection, and use such observations in assessing the credibility of the proffered testimony. SeasonsCoal Co. v. Cleveland (1984), 10 Ohio St.3d 77. In the case before us, the jury manifestly chose to disregard the exculpatory testimony of Story and Thompson, and give credibility to that of Barnes and Holmes. There is nothing from the record which compels this court to conclude that the jury lost its way and created such a manifest miscarriage of justice that would require a new trial. Appellant's second assignment of error is accordingly overruled.
Appellant's third assignment of error asserts that the trial court erred in failing to give a limiting instruction, which was not requested by the defense, with respect to the rebuttal testimony of attorney Erdy, used to impeach the testimony of defense witness Story, and with respect to the use of statements made by Thompson during his post-arrest interview with Detective Lanning.
Appellant asserts that the trial court should have given a limiting instruction to limit the purpose of the testimony to the impeachment of the witnesses, rather than as substantive evidence of appellant's guilt. Since the defense at trial did not request such an instruction, we again review under the plain error standard.
Although we agree with appellant that a limiting instruction was appropriate and that the trial court erred in failing to give one, we do not find this to constitute plain error in the context of this case. As set forth in our discussion of appellant's second assignment of error, there was other credible evidence from which the jury could have concluded appellant's guilt without improper reliance on rebuttal or impeaching evidence, and there is no indication in the record that the jury chose to take the testimony as more than rebuttal evidence. Appellant's third assignment of error is accordingly overruled.
Appellant's fourth assignment of error asserts that he was denied effective assistance of trial counsel. In order to establish a claim of ineffective assistance of counsel, appellant must first demonstrate that counsel's performance was so deficient that it was unreasonable under prevailing professional norms. Strickland v. Washington (1984),466 U.S. 668, 687-688. Appellant must then show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. At 694. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy." ' Strickland at 689, quoting Michell v. Louisiana
(1955), 350 U.S. 91, 101.
In keeping with this general deference to trial counsel's tactical decisions, we find that appellant did not receive ineffective assistance of counsel. Trial counsel was faced with a series of volatile and unreliable witnesses, two of whom had previously promised favorable testimony to both the prosecution and the defense. Particularly in the case of Thompson, when the witness recanted his prior sworn testimony, became agitated, and generally floundered on the stand, the defense chose to allow the rather confrontational process of impeachment by the prosecution to continue without objection, preferring to have the witness entirely discredited. Since Thompson had testified that appellant was in fact a participant in the Home Market robbery, this was a permissible tactical choice by counsel, who could reasonably hope that the jury would disregard Thompson's testimony entirely as unreliable, and that the prosecution's credibility would be globally effected as a result.
With respect to counsel's failure to request a limiting instruction to the testimony of attorney Erdy and Detective Lanning, the tactical choice is less easy to justify, but the impact of this omission, in the context of the evidence presented at trial, was not prejudicial such that appellant was denied his right to effective assistance of counsel. And moreover, we cannot conclude from this scenario that the outcome of the trial would have been any different.
We accordingly conclude that appellant was not denied his right to effective assistance of trial counsel. Appellant's fourth assignment of error is accordingly overruled.
In conclusion, appellant's first, second, third, and fourth assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
BRYANT and BOWMAN, JJ., concur.