JOURNAL ENTRY AND OPINION
{¶ 1} This is an appeal from a judgment of conviction and sentencing entered by Judge Thomas P. Curran after a jury found Torrance Cody[1] guilty of felonious assault with a firearm specification.[2]
Cody claims a number of errors, including evidentiary issues, ineffective assistance of counsel, and the failure to excuse a juror who had contact with him during a lunch break. We affirm.
 {¶ 2} From the record we glean the following: At 4:51 a.m. on October 19, 1998, East Cleveland police responded to an emergency call and discovered then thirty-year-old Kevin Johnson lying on the porch of a house on Shaw Avenue with a gunshot wound in each leg. Johnson had crawled there from 13316 Shaw, an abandoned house frequented by drug users, and when asked to identify his assailant, he stated that "Cody" had shot him.
 {¶ 3} Subsequent investigation revealed that the Northfield police had stopped Johnson for speeding on October 17, 1998, while he was driving a 1970 Pontiac GTO, which was later reported stolen by then twenty-eight-year-old Torrance Cody. The police impounded the car when they discovered that Johnson was driving without a license, but he was released on his own recognizance. When Cody went to reclaim his car he was arrested and charged in Johnson's shooting.
 {¶ 4} At trial Johnson admitted he had an ongoing crack cocaine habit, that he met Cody while working at a car wash and wanted to "swindle" him out of some money. On October 16, 1998, Johnson met Cody at a gas station and, while Cody agreed to drive him home, first they drove to Cleveland's west side to meet someone interested in buying one of Cody's restored classic cars. While the meeting took place Johnson, alone in the car, drove Cody's Pontiac to Akron that night and, the next morning, was stopped in Northfield, arrested and then released. He stated that when he returned to the car wash that day he learned that Cody had been there looking for him and, in response, told a car wash employee what had happened and the location of the car.
 {¶ 5} Johnson testified that during the early hours of October 19, 1998, he was using crack cocaine with three men at 13316 Shaw Avenue and, after the drugs were depleted, two men left and he laid down on a sofa. Later someone came into the house and, when he was closer, Johnson realized it was Cody. He stated that Cody "took his hood off, and he came out of his pocket with a pistol and held it dead to my chest." He ordered Johnson to take his clothes off and get on his knees, which Johnson did, but then Johnson attempted to escape and struggled with Cody, pushing him backward. As he ran for the door he was shot, once in each leg, after which Cody left and Johnson crawled to a neighboring house for help.
 {¶ 6} After the incident, Johnson stated that Cody approached him and offered him money and a car if he would change his testimony and claim that he had mistakenly identified his assailant. Police officers' testimony verified that at the scene Johnson named "Cody" as the shooter and that he had filed police reports concerning Cody's contact with him while the charges were pending. The judge denied a Crim.R. 29 motion at the close of the State's case and Cody presented six witnesses in defense.
 {¶ 7} James Gay testified that he had been doing drugs with Johnson on October 19, 1998, and as he was leaving the house, a man with a gun, who did not answer Cody's description, arrived and asked for Johnson. When asked to describe this man, Gay stated he "weighed about 210, and a caramel brown complexion, a bald head like mines." Wendy Harris and Dea Character each testified that they were present during Cody's pretrial encounters with Johnson, and each stated that Johnson voluntarily participated in the meetings and offered to make a statement exonerating Cody.
 {¶ 8} Theresa Taylor and Caroline Kennedy testified that Cody was sleeping at Taylor's house on the morning of October 19, 1998. Ms. Taylor testified that she was with Cody, who was her boyfriend at the time, and Ms. Kennedy testified that she dropped her child off at Taylor's for daycare at approximately 5:40 a.m. and saw Cody there. Cody testified that Johnson told him that he would not be allowed to continue a drug treatment program if he did not testify, and that he wanted money in return for his statement.
 {¶ 9} Cody was found guilty of felonious assault and the attached firearm specification, and was sentenced to a four year prison term consecutive to the mandatory three year term for the firearm specification, and no fine was imposed. Neither the transcript nor the journal entry of the sentence contain any reference to advising Cody that following his release from prison he would be subject to up to three years of post release control under supervision of the Adult Parole Authority or the advisements required under R.C. 2929.19(B)(3). Post release control, therefore, is not part of his sentence.[3]
 {¶ 10} The fifth of Cody's eight assignments of error asserts an abuse of discretion and violation of his constitutionally protected rights by permitting inadmissible character, hearsay, and other evidence that improperly impeached the credibility of defense witnesses and impermissibly bolstered the State's case. We address this assignment first because Cody also raises evidentiary issues in his claims of prosecutorial and judicial misconduct, and the admissibility of certain evidence will affect our resolution of those claims.[4] While the judge has discretion to admit or exclude evidence based upon the factual circumstances presented, his application of those facts to the rules of evidence is a question of law we review de novo.[5]
 {¶ 11} Cody contends the prosecutor asked unfair questions during cross-examination of defense witnesses and introduced inadmissible evidence through that questioning. He first argues that the prosecutor unfairly questioned his alibi witness, Ms. Taylor, about a police report through which Cody apparently had claimed to be at her house for thirty hours, from 5:30 p.m. on October 18, 1998, until 11:30 p.m. the next day. Although Cody ultimately argued that the report was erroneous and he had been at the Taylor home only until 11:30 a.m. on October 19, 1998, the State used this evidence to argue that he had actually made the unlikely claim.
 {¶ 12} When questioning a witness for impeachment purposes, a party may refer to facts not in evidence so long as the method of impeachment is otherwise allowed and there is a reasonable basis to imply the existence of the impeaching fact.[6] Extrinsic evidence of the impeaching fact is admissible if the evidence shows bias, sensory defect, or specifically contradicts the witness's testimony and is also admissible by Evid.R. 608(A), 609, 613, 616(A), 616(B), or 706.[7]
While evidence of Cody's police statement does not satisfy any of the requirements for admission of extrinsic evidence, the existence of the police report provided a reasonable basis for questioning him. The difficulty, however, is that Cody's statement had no value for the purpose of impeaching Ms. Taylor.
 {¶ 13} The State did not question Cody about his own statement or ask him how long he stayed at Taylor's on October 18th and 19th, 1998, and questioning concerning his statement was allowable only for the purpose of impeaching his testimony, not hers.[8] Furthermore, the State's case was unavoidably premised on the belief that Cody was not at Ms. Taylor's house at 4:51 a.m. on October 19, 1998, and, therefore, the State could not impeach her with a statement it believed to be false. The questioning was not intended to impeach Taylor, but to impeach Cody through her testimony.
 {¶ 14} Such questioning might have been appropriate if the evidence of Cody's statement had already been admitted through some other means; in this case, however, the prosecutor was questioning Taylor with facts that were not in evidence and could not be used to impeach her.
 {¶ 15} Nevertheless, we find the error in questioning Ms. Taylor about the statement does not require overturning the jury's verdict. A non-constitutional error in the admission or exclusion of evidence is harmless if substantial other evidence supports the verdict.[9]
Although the State argued that Cody's story of being with Ms. Taylor for thirty consecutive hours was not credible, this evidence did little to advance the primary credibility issue between Cody's and Johnson's versions of events. The jury had substantial other evidence on which to rely for this determination, including the ability to compare the witnesses' versions of events and corroborating testimony concerning Cody's alleged offer of money to Johnson in return for favorable testimony.
 {¶ 16} Cody admitted that his friend Ms. Harris contacted Johnson and arranged the first meeting between the pair, and also admitted that he spoke to Johnson in the courthouse lobby after specifically being told that he was not to have further contact with him. Although he claimed that Johnson was willing to sign a statement exonerating him after the first meeting, he presented no evidence that any statement was then presented to Johnson and admitted that he did not contact authorities after either incident. Johnson's claims, however, were corroborated not only by Cody's admissions, but by officers' testimony that Johnson contacted police after each incident. We find the State's use of Cody's statement in cross-examining Taylor was harmless error.
 {¶ 17} He next argues that the State improperly cross-examined defense witnesses about their financial status. Under Evid.R. 616(A), however, a witness's bias may be shown through either examination or extrinsic evidence, and Johnson's allegations of an offer of money for testimony were significantly corroborated and therefore provided a substantial basis for the judge to allow all witnesses to be questioned on the issue. The cross-examination of Ms. Character, whose testimony was most significantly harmed by questions concerning her financial distress, also was appropriate, not only because financial questions were generally appropriate in the circumstances, but because evidence showed her distress was particularly timely and that she had a close relationship with Cody. The judge was within his discretion to allow such questioning.
 {¶ 18} Cody also argues that, during Ms. Character's cross-examination, the State improperly introduced a police report stating that she was ordered out of the courtroom and subsequently removed from the building after displaying inappropriate behavior during a pretrial hearing. The State used this evidence and questioning to show that Ms. Character, who was Cody's business attorney and at one point represented him in the criminal proceedings, was so emotionally attached to his case that she could not be relied upon for accurate or credible testimony. The judge allowed questioning concerning the police report and also allowed the prosecutor to read from the report in questioning her about it. There is little doubt that the judge had discretion to determine that a factual basis existed for the questions, since the incident at issue occurred in his courtroom. Moreover, even though the prosecutor read from the document while questioning Ms. Character,[10]
she denied the charges and the document itself was never introduced. Although the questioning implied the existence of a document that contradicted her testimony, as long as there is a reasonable basis for the questioning the implication is appropriate.[11]
 {¶ 19} Cody next claims that all evidence concerning his alleged offer of money to Johnson and other attempts to influence his testimony should have been excluded as irrelevant and hearsay. He contends that evidence of subsequent events should not have been admitted as proof of the felonious assault and that Johnson's testimony concerning their conversations was hearsay. We disagree with both arguments because the evidence that Cody attempted to influence Johnson's testimony was an admission of guilt that was both relevant and excluded from the hearsay rule.[12] Cody was entitled to challenge Johnson's testimony and dispute his version of events, as he did, but he was not entitled to exclude it.
 {¶ 20} Cody next complains that a police officer inappropriately referred to a traffic citation issued to him, and that evidence of the citation was inadmissible hearsay. The officer, however, did not mention the citation in order to prove that Cody had been guilty or convicted of the violation,[13] but merely to show police efforts to locate him after the shooting. Furthermore, even if the evidence was inadmissible we would find it harmless because it is unlikely the jury would find a traffic citation increased Cody's propensity to commit felonious assault with a gun.
 {¶ 21} Next, Cody claims the judge erroneously allowed the State to bolster Johnson's testimony by showing that he had been informed of his ineligibility for statutory victim compensation. Ms. Harris testified that Johnson asked Cody for money to leave town and told him that if he did not get the money he would have to continue the case in order to be eligible for victim compensation. The prosecutor impeached her testimony by asking her whether she knew that, while in the hospital prior to his meeting with Cody, Johnson had been informed of his ineligibility for that compensation. This questioning was appropriate under Evid.R. 607 because it was probative of Ms. Harris's credibility and had a reasonable basis; although Johnson's hospital records were not included with the trial record, the transcript shows that they were offered and admitted, without objection, as business records and published to the jury. The prosecutor's questioning indicated that the records would reveal that Johnson was informed of his ineligibility, and thus the jury was able to determine those facts. Therefore, there was no abuse of discretion in allowing the questioning.
 {¶ 22} The final evidentiary objection claims that Johnson's declarations to police officers at the crime scene should have been excluded as hearsay. Cody argues that the declarations do not qualify as excited utterances under Evid.R. 803(2), reasoning that, because the first officers on the scene questioned Johnson about the crime instead of treating him immediately, the emergency was not acute. We disagree. The evidence showed that Johnson suffered two gunshot wounds from which he lost eight pints of blood, was forced to crawl to a neighboring house for help, and spent five months in the hospital thereafter. Furthermore, a declaration does not lose its character as an excited utterance simply because it was given in response to questioning.[14] There was no abuse of discretion in admitting the statements. This assignment is overruled.
 {¶ 23} Cody's first assignment of error alleges evidentiary issues that have been addressed supra, and prosecutorial misconduct. In order to sustain this allegation he must show not only that the prosecutor acted unfairly, but that the misconduct so prejudiced his defense that he was deprived of a fair trial.[15] The critical issue in this case was the jury's determination of the witnesses' credibility; Johnson claimed that Cody shot him and then offered him money to testify otherwise, while Cody claimed that Johnson named him as the assailant in order to file a civil suit for damages and to obtain government benefits. It is in this light that we scrutinize the misconduct allegations, as improprieties affecting the jury's credibility determinations are most likely to have prejudiced Cody.
 {¶ 24} He first contends that, in opening statement, the prosecutor erroneously stated that he instructed Johnson to take off his clothes because he was "going to leave this world the same way you came in[.]" However, while Johnson testified that he was ordered to take off his clothes at gunpoint, he did not testify to the quote offered in opening statement. Although such an opening statement would be improper if the prosecutor knew the evidence would not support it, the circumstances do not suggest a knowing attempt to mislead the jury. An opening statement is intended to let the jury know what a lawyer believes the evidence will show, and the failure of such evidence does not signify misconduct if the lawyer reasonably believed the statement would be supported.[16] Moreover, nothing in the record indicates that Cody was prejudiced by the statement; as noted, the primary issue was the witnesses' credibility, and he has not shown how the prosecutor's opening was likely to affect that issue.
 {¶ 25} He next asserts that the prosecutor's closing arguments improperly referred to the "thirty continuous hours" argument that we have already found was based on improper impeachment and facts not in evidence. As with the presentation of the evidence itself, however, we find that this argument was not critical to the jury's determination and did not deprive Cody of a fair trial. It made no difference whether he was at Ms. Taylor's home until 11:30 a.m. or 11:30 p.m. on October 19, 1998; the critical part of the alibi concerned his whereabouts at 4:51 a.m. on that date. Furthermore, this dispute likely had little effect on the jury's credibility determination because it was reasonable to argue, as Cody did, that the police report was the result of a typographical error. The jury's credibility determination was more likely based on the substance, consistency, and corroboration between the testimony of prosecution and defense witnesses.
 {¶ 26} As noted, Johnson's testimony was corroborated by apparently disinterested police officers, as well as that of Cody and other defense witnesses, who admitted to initiating pretrial contact with Johnson. Cody's testimony was supported by defense witnesses whose credibility was impeached by evidence of bias. Moreover, the transcript reveals that the jury could have viewed Johnson's testimony as more forthright than Cody's; Johnson's testimony was generally consistent and his answers to questioning responsive, while Cody's testimony could have been viewed as evasive, obstructionist, or even obstinate. Because we find that the "thirty continuous hours" argument was not a significant factor in the credibility determination, any error in presenting this argument was harmless beyond a reasonable doubt.[17]
 {¶ 27} He next submits that the prosecutor misstated a number of facts, including the time between Johnson's stealing the car and the shooting and whether there were witnesses to an incident at which Johnson testified that Cody appeared across the street from him and displayed a weapon in an apparent effort to intimidate him. While the prosecutor mistakenly stated, in both opening and closing statements, that Johnson was shot the day after stealing Cody's car, this confusion was not significant. The facts presented showed that Johnson stole the car on Friday evening, October 16, 1998, was arrested in Northfield on Saturday morning, October 17, 1998, began using crack cocaine at 13316 Shaw Avenue on Sunday, October 18, 1998, and was shot at that address on Monday morning, October 19, 1998. Although some witnesses misstated the dates, the sequence of events remained consistent and it made little difference whether the shooting occurred one day or three days after the car theft.
 {¶ 28} Moreover, although Cody complains that the prosecutor undermined his alibi by stating the shooting took place at 4:30 a.m. instead of 4:51 a.m.,[18] this argument was supported by the evidence. While the police responded to the emergency call at 4:51 a.m., the call was not made immediately after the shooting because Johnson first had to crawl to a neighboring house and get someone's attention. Therefore, the evidence reasonably supported the prosecutor's argument that the shooting took place before 4:51 a.m., and the jury was amply notified of the times and dates of the events as recorded by police.
 {¶ 29} Cody's next contention also fails because, even though he claims the prosecutor improperly referred to neighborhood drug dealers as "little kids," such a claimed misstatement is so far collateral to the issues in this case that it can only be harmless, and the transcript shows that Johnson did refer to them as "a couple little young guys, dope sellers, sitting up there looking at us talk." Moreover, although Johnson stated that these young drug dealers were present when Cody displayed a gun in an apparent effort to intimidate him, the prosecutor was nonetheless justified in arguing that Cody denied the incident only because there were no witnesses, in contrast to his other two meetings with Johnson, which were witnessed by Ms. Harris and Ms. Character. The prosecutor's argument reasonably could have been construed as referring to available witnesses, since both women were identifiable and present to testify while Johnson's description of the neighborhood dope sellers was too vague to allow their identification.
 {¶ 30} The next allegation of prosecutorial misconduct concerns claimed remarks about the credibility of witnesses made during closing argument. Although Cody argues a number of instances of impropriety, most of the cited comments show the prosecutor reminding the jury of its role as the arbiter of credibility and appropriately referring to conflicts in the evidence and testimony in arguing that the determination should favor the State. Three remarks bear noting, however, as the prosecutor first argued that Johnson was believable, stating:
 {¶ 31} "This is why, because he's telling the truth. He doesn't sugar coat the truth. You heard him. He tells you the truth, whether it's good, whether it's bad, and there is some bad.
 {¶ 32} "But at least he tells you the truth, and he doesn't evade the questions. He tells it like it is."
 {¶ 33} Later, in concluding her closing remarks, the prosecutor stated:
 {¶ 34} "The only person you heard from, who could tell you where this man was at the time, was Kevin Johnson, and he told you the truth."
 {¶ 35} A prosecutor is not allowed to express a personal opinion concerning the credibility of evidence, but can argue that the character, quality, or consistency of particular evidence or witnesses should be considered when assessing credibility.[19] Although it is never advisable for a prosecutor to aver that a witness is "telling the truth," the prosecutor's first remarks show that her argument was not intended to inappropriately boost Johnson's testimony, but to highlight the circumstances that bolstered his credibility, such as his admission of unfavorable facts and his forthright manner. Comments stating the prosecutor's opinion on the evidence are appropriate[20] and, while the prosecutor might have been more circumspect in making the argument, her statements that Johnson was "telling the truth" did not prejudice Cody's defense here, where the jury was fully aware that it was the arbiter of witnesses' credibility and that the case critically turned on that issue.
 {¶ 36} The prosecutor's second remark concerning Johnson's credibility raises a closer question, as she did not comment upon any particularly believable aspect of his testimony, but instead summed up her argument by stating that Johnson "told you the truth." Again, however, we do not find that this statement deprived Cody of a fair trial because the prosecutor's argument, taken as a whole, was appropriately directed at notifying the jury of its duty and authority to assess credibility and pointing out aspects of the evidence bearing on that issue.[21] Based on the totality of trial circumstances, the statements did not deprive Cody of a fair trial even if they were improper.
 {¶ 37} Finally, the prosecutor argued that Ms. Taylor's testimony concerning Cody's alibi was "mumbo jumbo" because she was unable to reconcile her version of events with the claim that Cody had been at her house for thirty continuous hours between 5:30 p.m. on October 18, 1998 until 11:30 p.m. on October 19, 1998. This type of disparaging comment is improper[22] and the argument was itself improper because it implied that Ms. Taylor's testimony was not credible based upon a statement that was not in evidence and, more importantly, which the prosecutor could not have regarded as true without also admitting the truth of Cody's alibi.
 {¶ 38} While the State's "thirty continuous hours" argument and its improper impeachment of Ms. Taylor's testimony with a statement it necessarily regarded as untrue represent a disturbing trend in prosecutorial conduct and in the quality of legal argumentation in general, we nonetheless find the prosecutor's remarks insufficient to warrant reversal. However, we recognize and agree with the tenor of Ohio Supreme Court Chief Justice Moyer's warning concerning the failure to mete out consequences for such misconduct.[23] The failure of courts to do anything more than issue "ceremonial"[24] reprimands in such situations encourages prosecutors to gain convictions through inappropriate means because they are undeterred by toothless paeans to ethical behavior. If we are to stop short of punishing the State for a prosecutor's misbehavior by refusing to overturn otherwise valid convictions, perhaps such cases should routinely be referred to disciplinary counsel so that individual prosecutors can be impressed with the need for ethical behavior. If such referrals threaten to swamp the current disciplinary system it might be necessary to create a committee just for this purpose.
 {¶ 39} Cody's final claims of prosecutorial misconduct concern the cross-examination of his business attorney, Ms. Character. The prosecutor cross-examined her concerning her suspension from the practice of law, although the suspension was stayed and ultimately lifted when she paid restitution, totaling $12,000.00, to two former clients. In connection with this questioning the prosecutor implied that she was not duly licensed to practice law during a period in which she was representing Cody in this case. Although the judge ultimately gave the jury a curative instruction stating that Ms. Character was authorized to practice law at all relevant times, Cody claims the instruction was insufficient to correct the taint. We disagree. We presume that a jury follows the judge's instructions, including curative instructions, and Cody has not shown how the record defeats that presumption.[25] Moreover, the questions concerning the disciplinary action were relevant both to impeach her credibility[26] and, as already discussed, to show her possible bias because of financial needs.
 {¶ 40} The prosecutor also used two documents to impeach Ms. Character, and read aloud from them under the guise of refreshing her memory. She first read from the disciplinary judgment imposing the suspension and stay pending payment of restitution. She then cross-examined her about being removed from the courtroom, and ultimately the courthouse itself, for inappropriate behavior during a pretrial conference. After Ms. Character denied that her removal was for being verbally abusive to either the judge or Johnson, the prosecutor read from the police report, again as a means of refreshing her memory, even though she testified that her memory was not refreshed by the document.
 {¶ 41} When a document is used to refresh a witness's memory, only the opposing party is entitled to introduce it into evidence.[27] If a witness states that her memory is not refreshed the questioning is ended,[28] and the prosecutor is not allowed to read the documents aloud under the guise of questioning the witness.[29] We find, however, that the questioning here does not require overturning the conviction. The disciplinary suspension, as read by the prosecutor, supported Ms. Character's testimony that she was authorized to practice law pending her payment of restitution, and the judge instructed the jury to that effect. Therefore, reading from this entry did not prejudice the defense.
 {¶ 42} The police report concerning her removal from the courtroom did harm the defense because it implied that her emotional involvement prejudiced her testimony. Nevertheless, we find the error harmless because the evidence could have been admitted in rebuttal if the questioning had not been allowed on cross-examination. Extrinsic evidence is allowed to establish bias[30] and, even though the document itself was hearsay, the prosecutor could have presented the reporting officer to testify personally on the matter.
 {¶ 43} Cody also claims that the prosecutor deliberately withheld the disciplinary judgment and the police report concerning the pretrial incident when they should have been disclosed in pretrial discovery.[31]
Crim.R. 16(B)(1)(C) requires, and Cody requested, production of documents "within the possession, custody or control of the state, and which are material to the preparation of [the] defense, or are intended for use by the prosecuting attorney as evidence at the trial[.]" Despite the fact that the prosecutor improperly read aloud from the documents in questioning Ms. Character, they were not subject to discovery because they were not "intended for use * * * as evidence[.]"[32] This assignment of error is overruled.
 {¶ 44} In his third assignment, Cody alleges judicial misconduct during pretrial and trial proceedings. A claim of judicial misconduct can be sustained only where compelling evidence rebuts the presumption of a judge's disinterestedness.[33] None of Cody's complaints rise to this level, as he first claims that the judge overstepped his discretion when he ordered that Johnson, who was in custody at the time and dressed in prisoner's clothing, be removed from the courtroom and not sit at the prosecutor's table while so dressed. This order, however, was within the judge's discretion as part of his authority to "control all proceedings during a criminal trial,"[34] and we do not find that the order indicated a bias against Cody. The judge was within his discretion in finding that Johnson's constant presence in prisoner's clothes would undermine the fair and orderly proceeding of the trial.[35]
 {¶ 45} He also claims the judge showed bias in his opening remarks to the jury, in resolving the issue of a curative instruction after Ms. Character's testimony, and in interviewing a juror privately after the juror had contact with Cody during a lunch break. The opening remarks cited, however, consist solely of the judge's reading the indictment to the jury pool, and cannot be seen as bias.[36] The judge's resolution of the curative instruction issue also does not show bias because he determined the issue in Cody's favor. Finally, as discussed below, the judge's private interview of a juror was conducted with the knowledge and approval of both parties, and Cody declined a subsequent invitation to examine the juror himself.
 {¶ 46} His last claim of judicial bias concerns a draft of a letter to the Cuyahoga County prosecutor, apparently written by the judge and stating the assistant prosecutor in Cody's case had done an excellent job. While we are concerned with the timing of this letter and its inclusion among the judge's notes in this case, it does not itself rise to the "compelling"[37] level necessary to find judicial bias and there is no further evidence in the record. While evidence outside the record might shed light on this claim in a later proceeding, the letter of recommendation, standing alone, is not evidence of misconduct or bias.[38] This assignment of error is overruled.
 {¶ 47} Cody's fourth assignment of error involves alleged constitutional violations because the judge failed to conduct a private voir dire of a juror and failed to hold a mandatory hearing, declare a mistrial or excuse a juror who allegedly claimed to have had a chance out-of-court encounter with him.
 {¶ 48} On the third day of trial a juror reported that, during the lunch break, while Cody was speaking with a family member, he looked at the juror and told the family member something to the effect of "he knows I'm innocent." The judge interviewed the juror privately, with the approval of both parties, and determined that the contact was minor and the juror was not affected, even though it appeared that Cody made the statement deliberately. Cody argued that the juror should be excused and replaced with an alternate, but declined the judge's invitation to examine the juror further, stating that any further examination or separation from the rest of the jurors might influence that juror or arouse suspicion among the others and, thus, cause further prejudice if the judge maintained his ruling that the juror need not be excused.
 {¶ 49} Where there has been ex parte contact between a juror and a party, witness, or judge, there is a presumption of prejudice that can be rebutted, and the juror retained, only if the State satisfies a heavy burden of showing the contact harmless.[39] The judge interviewed the juror privately and stated, on the record, his unequivocal belief that the juror had not been adversely affected. Moreover, the judge could have ruled that Cody invited the error by deliberately initiating the contact, and thus was not entitled to excuse the juror on his own motion.[40] We overrule this assignment of error.
 {¶ 50} Cody's sixth assignment of error challenges both the denial of his motion for acquittal on the sufficiency of the evidence and the verdict on its manifest weight. A sufficiency claim raises a question of law that we review de novo[41] to determine "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[42] In contrast, the purpose of manifest weight review is to determine "whether the evidence produced attains the high degree of probative force and certainty required of a criminal conviction."[43] Instead of looking for merely sufficient evidence, manifest weight review tests whether the verdict is supported by substantial evidence.[44] Although the scope of review broadens, the standard of review is more deferential. Under the manifest weight test:
 {¶ 51} "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."[45]
 {¶ 52} Johnson's testimony alone provides sufficient evidence to convict, because he testified that Cody confronted him at 13316 Shaw Avenue, ordered him to take off his clothes at gunpoint, and shot him as he tried to escape. He established all the elements of felonious assault and the firearm specification. Cody's argument, however, is more focused on the weight of the evidence, as he attacks Johnson's credibility. He claims that the jury should not have believed Johnson, an admitted drug addict and thief, in light of his alibi evidence and supporting witnesses. As discussed supra, however, the evidence gave the jury a reasonable basis for believing Johnson's testimony over Cody's defense. Johnson answered questions directly, while Cody's testimony was evasive and incomplete. Furthermore, despite claims to the contrary, Johnson's testimony concerning Cody's contact with him was corroborated and believable, while Cody's explanations and supporting witnesses did not ring true.
 {¶ 53} Cody also argues that Johnson did not identify him clearly because he testified that the room was dark and he first believed that the figure in the doorway was someone else. Johnson later testified, however, that he recognized his assailant clearly as the encounter continued because Cody came nearer and ordered him to take off his clothes at gunpoint, during which time Johnson was able to observe and identify him. We do not find that the jury lost its way in returning a guilty verdict. This assignment of error is overruled.
 {¶ 54} Cody contends, in his seventh assignment of error, that the jury was given erroneous instructions on felonious assault and the lesser included offense of aggravated assault. When instructing the jury on felonious assault and the inferior offense[46] of aggravated assault, the judge mistakenly stated:
 {¶ 55} "[I]f these elements in mitigation do not exist, * * * then you will sign the verdict form finding the Defendant guilty of aggravated assault.
 {¶ 56} "If these elements in mitigation do exist, then you will find the Defendant guilty of felonious assault."
 {¶ 57} Cody argues that this mistaken instruction so confused the jury that it was unable to properly assess and distinguish the two offenses. The offense of aggravated assault contains the same elements as felonious assault, but if the jury finds the additional elements that the defendant acted under serious provocation, the offense is mitigated.[47]
Although the judge at one point mistakenly stated that the existence of mitigating factors would require a finding of guilt to felonious assault, the entirety of his instruction on the issue should have dispelled any confusion. The judge first stated that the offense of aggravated assault contained mitigating elements, and if those elements are found, "then you may not find the Defendant guilty of felonious assault." At the conclusion of the instruction, just after giving the mistaken formulation, the judge stated:
 {¶ 58} "In summary, if you find that the State of Ohio has proved beyond a reasonable doubt all the essential elements of felonious assault, as charged in the indictment, and further that elements in mitigation have not been established by a preponderance of the evidence, then you must find the Defendant guilty of felonious assault."
 {¶ 59} In addition, the jury was told that a written copy of the instructions would accompany them to the jury room and that copy correctly stated the law. Although the written instructions contained a typographical error in which both offenses were stated to exist if the mitigating elements "do not exist," the extra word "not" was correctly crossed out for the aggravated assault offense. Despite the judge's momentary error, we do not find that the instruction confused the jury.
 {¶ 60} We also find that Cody was not prejudiced by the instruction because the record does not show mitigation sufficient to authorize a finding of aggravated assault. The evidence showed that Johnson stole Cody's car and was shot over two days later. This is not the "sudden" passion expressly stated in R.C. 2903.12 and, even if a seething rage can turn into a sudden passion at some later date, we find as a matter of law that such seething cannot reasonably turn to sudden passion where the underlying crime is the theft of a car.[48] A property crime should not so distress a victim that the passage of time increases the desire for vigilantism — instead, the passage of time should reasonably allow the victim time to control his emotions and let the proper authorities address the crime. We overrule this assignment of error.
 {¶ 61} In his second assignment of error Cody alleges ineffective assistance of counsel. We address this assignment now because a number of the claims of ineffective assistance refer to errors claimed in previous assignments. Many refer to his lawyer's failure to object but we have not relied on waiver of error in resolving any of those assignments. Instead, we have addressed each issue on its merits and determined that the claimed error either was not objectionable or was harmless. Therefore, to the extent Cody claims ineffective assistance based on assignments already addressed, we overrule his claims because his lawyer's conduct was within professional standards or because he has not shown a reasonable likelihood that the outcome of his trial would have been different absent the error.[49] Our findings of harmless error necessarily show a lack of prejudice with respect to the ineffective assistance claims as well, because there is no reasonable probability that correction of the error would change the outcome.[50]
 {¶ 62} Cody also claims his lawyer rendered ineffective assistance because he failed to request limiting instructions concerning impeachment evidence and at times misstated the facts in evidence, such as the dates and times of the events. We reject both of these claims because no prejudice resulted. Although a limiting instruction ordinarily is appropriate where a witness has been impeached by an inconsistent statement that is not admissible for its truth,[51] the impeachment evidence here was largely directed at establishing witness bias and there was no danger that the jury would use it for purposes other than assessing witness credibility. The defense lawyer's misstatements of fact, like the misstatements claimed to be prosecutorial misconduct, also did not prejudice the defense. Any misstatements concerned relatively minor issues and we do not find the jury was confused or misled about the primary issues in the case.
 {¶ 63} The remainder of Cody's claims of ineffective assistance raise issues that cannot be sustained because evidence outside the record is necessary to establish or assess their validity. These include claims that his lawyer failed to prepare witnesses, failed to investigate and locate witnesses, failed to call available witnesses, and failed to present evidence or elicit proper testimony from witnesses. Although some evidence in the record might be used to raise these questions, Cody must still show what evidence or testimony was available in order to show both unprofessional conduct and prejudice. Similarly, the current record is insufficient to show ineffective assistance on the claims that Cody's lawyer failed to request a mistrial after Ms. Character's testimony and failed to present evidence challenging the juror-tampering allegation. On the juror-tampering allegation, however, the lawyer articulated his reasons for declining to examine the juror further, and both Cody and his brother, Ray Cody, addressed the judge to explain their version of events. While evidence outside this record might show otherwise, the evidence currently available suggests that the lawyer made reasonable tactical choices under the circumstances, and that Cody's explanations of the events did not sway the judge's opinion.
 {¶ 64} The last claims of ineffective assistance concern the lawyer's failures to request a pre-sentence investigation and to inform Cody of a plea offer. Again, without evidence of what effect a pre-sentence investigation would have had on the judge's sentence we cannot assess or sustain this claim. Moreover, although the lawyer referred to a plea offer during the sentencing hearing, there is no evidence on this record that he failed to communicate that offer to Cody. This assignment of error is overruled.
 {¶ 65} Cody's eighth assignment of error claims an abuse of discretion by sentencing him over the minimum time and not giving notice of post-release control. Prison terms for second degree felonies range in one year increments from two to eight years. R.C. 2929.14(B) imposes a presumption that minimum term is appropriate for offenders sentenced to prison for the first time, and a judge imposing a first-time prison term must recognize and address that presumption prior to imposing a longer term.[52] In this case the judge recognized that Cody was facing a first-time prison term and, after reference to some R.C. 2929.12
factors, stated:
 {¶ 66} "So under the circumstance I cannot say that you are entitled to a minimum sentence. I think it would be inappropriate to give you the minimum sentence." He then explained Cody's conduct was not the worst form of the offense and imposed a four year term of imprisonment.
 {¶ 67} While Cody alleges the judge relied upon allegations outside the record in imposing a sentence of more than two years, there is sufficient fact and analysis to show he considered appropriate statutory provisions before imposing more than the minimum sentence.
 {¶ 68} We agree that post release control is not a part of Cody's sentence and find this portion of his assignment of error moot and overrule the remainder.
Judgment affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Patricia A. Blackmon, P.J. and Terrence O'DOnnell, J., Concur.
[1] The notice of appeal, and thus our caption, states Cody's first name as "Torrence," but the record otherwise refers to him consistently as "Torrance."
[2] R.C. 2903.11, 2941.145.
[3] Woods v. Telb, 89 Ohio St.3d 504, 513, 2000-Ohio-171, 733 N.E.2d 1103.
[4] To the extent that the first assignment of error also raises evidentiary issues, we will address them here as well.
[5] See Calderon v. Sharkey (1982), 70 Ohio St.2d 218, 222-223, 24 O.O.3d 322, 436 N.E.2d 1008 (concluding that "close evidentiary questions are within the domain of the trial court"); see, also, Rohde v. Farmer
(1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685, paragraphs one and two of the syllabus (abuse of discretion standard does not affect questions of law).
[6] Evid.R. 607(B); State v. Gillard (1988), 40 Ohio St.3d 226,230-231, 533 N.E.2d 272.
[7] Evid.R. 616.
[8] Evid.R. 608(B), 613.
[9] State v. Griffin (2001), 142 Ohio App.3d 65, 79, 753 N.E.2d 967.
[10] This issue will be discussed in the assignment concerning prosecutorial misconduct, infra.
[11] Evid.R. 607(B).
[12] State v. Soke (1995), 105 Ohio App.3d 226, 250, 663 N.E.2d 986.
[13] Cf. Evid.R. 803(21).
[14] State v. Wallace (1988), 37 Ohio St.3d 87, 524 N.E.2d 466, paragraph two of the syllabus.
[15] State v. Phillips, 74 Ohio St.3d 72, 90, 1995-Ohio-171,656 N.E.2d 643.
[16] State v. Neal (Jan. 23, 1996), Franklin App. No. 95APA05-542.
[17] State v. Smith (1984), 14 Ohio St.3d 13, 15, 14 OBR 317,470 N.E.2d 883.
[18] By arguing that the shooting took place earlier, the prosecutor opined that Cody could have returned to Theresa Taylor's house by 5:30 a.m.
[19] State v. Tyler (1990), 50 Ohio St.3d 24, 41, 553 N.E.2d 576.
[20] Id.
[21] State v. Keenan (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203.
[22] Smith, 14 Ohio St.3d at 14.
[23] State v. Fears, 86 Ohio St.3d 329, 350, 1999-Ohio-111,715 N.E.2d 136 (Moyer, C.J., concurring in part and dissenting in part).
[24] Id. at 353 (citation omitted).
[25] State v. Garner, 74 Ohio St.3d 49, 59, 1995-Ohio-168, 656 N.E.2d 623.
[26] Evid.R. 608(B).
[27] Evid.R. 612.
[28] Dellenbach v. Robinson (1993), 95 Ohio App.3d 358, 368,642 N.E.2d 638.
[29] Dayton v. Combs (1993), 94 Ohio App.3d 291, 298,640 N.E.2d 863.
[30] Evid.R. 616(A).
[31] He also claims the prosecutor withheld an affidavit submitted by Character in support of Cody's motion to reinstate bail, but the record does not show that the prosecutor used this document.
[32] In re Jones (1998), 132 Ohio App.3d 173, 175, 724 N.E.2d 839.
[33] In re Disqualification of Olivito (1994), 74 Ohio St.3d 1261,1263, 657 N.E.2d 1361.
[34] R.C. 2945.03.
[35] State v. Moton (Aug. 27, 1999), Richland App. No. 98 CA 117.
[36] State v. Lamar, 95 Ohio St.3d 181, 211-212, 2002-Ohio-2128,767 N.E.2d 166.
[37] Olivito, supra.
[38] See, e.g., Toledo Bar Assn. v. Gabriel (1991), 57 Ohio St.3d 18,19, 565 N.E.2d 570 (letters of reference considered in disciplinary proceeding).
[39] State v. Phillips, supra, 74 Ohio St.3d at 88-89.
[40] State v. Simmons, Stark App. No. 2001CA00245, 2002-Ohio-3944, at ¶ 16.
[41] State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541.
[42] (Emphasis sic.) State v. Stallings, 89 Ohio St.3d 280, 289,2000-Ohio-164, 731 N.E.2d 159, quoting Jackson v. Virginia (1979),443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.
[43] State v. Getsy, 84 Ohio St.3d 180, 193, 1998-Ohio-533,702 N.E.2d 866.
[44] Id.
[45] State v. Martin (1983), 20 Ohio App. 172, 175, 20 OBR 415,485 N.E.2d 717.
[46] State v. Deem (1988), 40 Ohio St.3d 205, 210-211,533 N.E.2d 294.
[47] Id.
[48] Id. at 211.
[49] Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Johnson, 88 Ohio St.3d 95, 108,2000-Ohio-276, 723 N.E.2d 1054.
[50] State v. Fluellen, Cuyahoga App. No. 78532, 2002-Ohio-3262, at ¶ 84.
[51] Evid.R. 613; State v. Dacons (1982), 5 Ohio App.3d 112, 115, 5 OBR 227, 449 N.E.2d 507.
[52] State v. Edmonson, 86 Ohio St.3d 324, 328, 1999-Ohio-110,715 N.E.2d 131; State v. De Amiches (Mar. 1, 2001), Cuyahoga App.No. 77609.