**[Cite as *In re J.P.*, 2023-Ohio-4816.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: J.P. | : | APPEAL NOS. | C-220647 |
| | | | C-220648 |
| | : | TRIAL NOS. | 21-1175X |
| | | | 21-1195X |
| | : | | |
| | : | *O P I N I O N.* | |

Appeals From: Hamilton County Juvenile Court

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: December 29, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Keith Sauter*, Assistant Prosecuting Attorney, for Appellee State of Ohio,

*Raymond T. Faller*, Hamilton County Public Defender, and *Joshua A. Thompson*, Assistant Public Defender, for Appellant J.P.

**CROUSE, Presiding Judge.**

{¶1}   Appellant J.P. was adjudicated a delinquent child for acts that, if committed by an adult, would constitute felonious assault and felony murder. J.P. was involved in a fight with N.G., which ended when J.P. stabbed N.G. in the neck with a knife. N.G. died shortly thereafter from her injury. At trial, J.P. sought to justify her actions as self-defense. For the following reasons, we affirm the judgments of the juvenile court.

## I. Procedural and Factual History

{¶2}   Prior to the events of April 2021, J.P. and N.G., both 13-year-old girls, had been close friends. Sometime before the end of the school day on April 19, 2021, N.G. confided in J.P. that she had contracted a sexually transmitted disease ("STD"). While on the Metro bus home from school on April 19, it became apparent that N.G.'s secret had gotten out when other students bullied N.G. about having an STD. N.G. assumed that J.P. had shared her secret.

{¶3}   Later that afternoon, N.G., accompanied by her 15-year-old brother, M.G., and her female cousins, 13-year-old C.W. and 18-year-old A.G., went to J.P.'s house. While J.P. cowered behind her mother at the door, N.G. and her companions insisted that J.P. come out to fight to answer for her leaking N.G.'s secret. N.G. and her companions threatened to beat up J.P. However, J.P.'s mother refused to let the group fight with J.P. Although J.P.'s mother seemed amenable to letting J.P. fight one-on-one with N.G., that option was not acceptable to N.G. and her companions. Eventually, the group left, threatening to return with N.G.'s mother.

{¶4}   Later that night, at around 9:00 p.m., J.P. asked her mother if she could walk her cousin, S., out to the curb. J.P.'s mother agreed.

2

{¶5} Around the same time, N.G., M.G., C.W., and A.G. drove past J.P. They testified that they were headed to a restaurant. When the group saw J.P. outside of her house, A.G. stopped the car. N.G. and C.W. immediately got out of the car. N.G. approached J.P. In C.W.'s account, M.G. and A.G. were delayed getting out of the car by 15 to 20 seconds. Both M.G. and C.W. testified that J.P. was accompanied by three or four other, unidentified people.

{¶6} According to C.W., J.P. asked the group, "Let me call my mom." According to J.P.'s mother, J.P. called her and told her, "Momma, they got me. They jumped me. Get here." J.P. then tossed her phone aside and approached N.G.

{¶7} N.G. squared up to J.P., ready to engage in a fistfight. J.P. pulled out a knife as she approached N.G. According to M.G., N.G. put her hand up and tried to take the knife from J.P. Then J.P. slashed at N.G., stabbing her once in the neck.

{¶8} N.G.'s companions loaded N.G. back in the car and drove her home. From there, N.G. was taken to the hospital by ambulance, but the lifesaving efforts were unsuccessful. N.G. succumbed to her wound. Later that night, J.P.'s mother took J.P. to surrender at the police station.

{¶9} The state filed complaints alleging that J.P. was a delinquent child for conduct that, if committed by an adult, would constitute purposeful murder under R.C. 2903.02(A), felonious assault under R.C. 2903.11, and felony murder under R.C. 2903.02(B).

{¶10} The state obtained serious youthful offender ("SYO") indictments on all charges, but the juvenile court dismissed the SYO indictments because the state failed to follow the proper statutory procedure. This court affirmed the juvenile court's decision in *In re J.P.*, 2022-Ohio-539, 185 N.E.3d 626 (1st Dist.).

{¶11} The state filed a motion to prevent defense expert witness Dr. Jean Deters from testifying at trial. The court granted the motion in part and ordered that Dr. Deters "may not testify as to the fact issues in the case, i.e. self defense and culpability."

{¶12} The case was tried in September 2022. The juvenile court found J.P. not guilty of purposeful murder, but adjudicated her delinquent on the felonious-assault and felony-murder counts.

{¶13} The court placed J.P. on probation and suspended commitment to DYS until her 21st birthday. The court ordered that J.P. complete rehabilitative programming at a locked facility through her probation.

{¶14} This appeal timely followed.

## II. Analysis

{¶15} J.P. raises three assignments of error. First, J.P. argues that her adjudication was against the manifest weight of the evidence. Second, J.P. argues that the trial court abused its discretion in refusing to admit the expert report and testimony of psychologist Dr. Jean Deters. Finally, J.P. argues that the trial court abused its discretion by admitting improper character evidence in the form of a video of a previous fight and by permitting the state to refresh a witness's recollection through improper means.

### A. First Assignment of Error

{¶16} In reviewing a claim of self-defense, the appellate court applies a sufficiency-of-the-evidence standard to whether the defense has met its burden of production and a manifest-weight-of-the-evidence standard to whether the state has met its burden of persuasion. *State v. Messenger*, 171 Ohio St.3d 227,

2022-Ohio-4562, 216 N.E.3d 653, ¶ 26.

{¶17} In reviewing whether a conviction runs counter to the manifest weight of the evidence, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We will review "the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 59, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). However, we will reverse the trial court's decision to convict and grant a new trial only in "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *Martin* at 175.

{¶18} "The elements of self-defense in the use of deadly force are: (1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape from such a danger was in the use of such force, and (3) the defendant did not violate any duty to retreat or avoid the danger." *State v. Smith*, 1st Dist. Hamilton No. C-190507, 2020-Ohio-4976, ¶ 48, citing *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002). Each element is required, and the absence of any element is fatal to the defense. *State v. Terry*, 1st Dist. Hamilton No. C-220379, 2023-Ohio-2074, ¶ 9. Under most circumstances, R.C. 2901.09(B) removes the duty to retreat, *State v. Mitchell*, 1st Dist. Hamilton No. C-220471, 2023-Ohio-2604, ¶ 17, and the juvenile court found that J.P. had no duty

to retreat.

**{¶19}** The juvenile court found that J.P. was at fault for creating the situation that gave rise to the affray by leaving home, armed with a knife. The court stated in its findings of fact that:

The State argues that J.P. created the situation and thus is not protected by a self-defense claim because she started the interaction earlier in the day by sharing N.G.'s secret. Without sharing the secret, they argue, N.G. would not have wanted to fight J.P. at all.

The evidence shows both N.G. and J.P. were equally responsible for creating the interaction leading to N.G.'s death. First, regardless of what happened on the Metro, violence and threats of violence were not excused as a reaction. The state argues that there was a fight on the bus and N.G. was scared, however State's Exhibit 11 does not show a fight or even an excitable argument.

The parties gloss over the fact that N.G. and J.P. were going to physically fight to settle the alleged wrongdoing, which is unacceptable conflict resolution for thirteen year old girls, though the Court would prefer to hear Assault cases and not Murder. Though the initial verbal argument may have started because of a leaked secret, when N.G. and her cousins went to J.P.'s home, they escalated emotions and created a heightened sense of confrontation and danger. J.P. argues that she carried the knife with her because she had heard what N.G.'s group had said earlier in the day, and she was afraid they would follow through on their threats. If that is true, leaving her home outside, after dark,

without an adult created a dangerous situation. J.P. points the Court to the video of the confrontation outside of her home after school that day, noting that J.P. hid behind her Mother because she was scared. That video was daytime, with lots of other people around in the neighborhood. It is clear that J.P. either did not believe the group's statements or she wanted to fight N.G. that night. She left her home, in the dark, and took a knife with her, as if she was preparing for the fight ahead. Knowingly entering a dangerous situation, made more volatile by the events of the day, leaves J.P. without the ability to claim she acted in self-defense.

{¶20} We hold that the juvenile court erred in concluding that J.P. caused the affray by leaving her home armed with a knife, as if she were preparing for a fight. The evidence was undisputed that J.P. left her home to walk her cousin to the curb. N.G. and her friends drove past J.P. on their way to a restaurant and decided to stop the car and confront J.P. There was no evidence that there was a planned fight at this time. Furthermore, this court has previously held that a defendant's mere possession of a weapon does not create the situation that gives rise to the affray where the possession does not influence the victim's use of force against the defendant. *See In re B.M.*, 1st Dist. Hamilton No. C-170103, 2018-Ohio-1733, ¶ 11 ("The presence of the knife had no influence on [the victim]'s decision to place his arms around [the defendant] and did not create the situation that gave rise to the assault."). There is no evidence in the record that J.P.'s possession of the knife influenced N.G.'s decision to approach J.P. and square off for a fight.

{¶21} Under the circumstances, the juvenile court's conclusion that J.P. was

at fault in causing the affray is not supported by the evidence. However, this does not end our analysis.

**{¶22}** The next element requires that J.P. "had a bona fide belief that she was in imminent danger of great bodily harm or death and her only means of escape from such danger was stabbing" N.G. *In re B.M.* at ¶ 12. This requires the trier of fact to "consider the entire situation and determine whether the person's actions were reasonable under the circumstances." *Id.*, quoting *In re Bumpus*, 1st Dist. Hamilton No. C-020776, 2003-Ohio-4307, ¶ 11.

**{¶23}** In analyzing this element, the juvenile court found:

> The second factor of the self-defense claim, that there were reasonable grounds to believe that she was [in] imminent danger of death or great bodily harm, fails for the same analysis outlined above. Looking at the day as a whole, which is what both parties urged the Court to do, leaves the Court with the view that N.G. and J.P. were determined to fight each other on April 19, 2021, and that any fear of harm J.P. had was that harm caused by a fistfight. Even if the Court found merit in the argument that J.P. was fearful of great bodily harm or death because the group was going to "jump" her rather than "fight" her, the law only provides a self-defense claim for great bodily harm or death.

> \*   \*   \*

> Notably, though, is the reasonable use of force requirement as an ancillary factor to the self-defense analysis. Self-defense is only available if the person used force reasonably necessary under the

8

circumstances to protect themselves from an apparent danger. If the force used is greatly disproportionate to the apparent danger, then self-defense is unavailable.

Both J.P. and N.G. were thirteen years old on April 19, 2021. The theme from both sides of the case was that this was supposed to be a fight between J.P. and N.G., but the other side took it too far. For the Defense, they argue that N.G. escalated the one-on-one fight by bringing others with her. The State argues that J.P. unnecessarily brought a knife to a fistfight. As mentioned earlier, a set up fight as a method of conflict resolution is not acceptable. However, the fight was understood to be a fistfight. J.P.'s claim that she had the knife for protection circles back to the first factor analysis of entering a volatile situation with an assumption that something would happen. The Court declines to find that children are permitted to arm themselves for preventative self-defense where they anticipate needing to settle a beef.

{¶24} As stated above, the uncontroverted testimony that N.G. and her companions were driving to a restaurant when they saw J.P. and stopped the car when they saw her standing at the curb contradicts the trial court's finding that there was "supposed to be a fight between J.P. and N.G." J.P. was near her home when N.G. confronted her, and there is no evidence to imply that J.P. was out looking for N.G. when the confrontation occurred.

{¶25} However, within the second element of self-defense is a requirement that the defendant use no more force than is reasonably necessary to repel the attack. *State v. Rhymer*, 1st Dist. Hamilton No. C-200164, 2021-Ohio-2908, ¶ 19-20.

9

Whether the force used was excessive is a question for the factfinder. *State v. Kendricks*, 10th Dist. Franklin Nos. 10AP-114 and 10AP-115, 2010-Ohio-6041, ¶ 39. We have previously rejected a manifest-weight challenge where the defendant stabbed an unarmed assailant who was strangling the defendant. *State v. Jordan*, 1st Dist. Hamilton No. C-210603, 2022-Ohio-2566, ¶ 60 ("While Jordan may have shown that Cutts started the fight and that he reasonably believed he had to use force to protect himself, the amount of force that he used was not reasonably necessary.").

{¶26}  Furthermore, testimony at trial revealed that J.P. was not alone. C.W. testified that there were three or four other people, possibly including J.P.'s brother, with J.P. at the time of the final altercation between J.P. and N.G. M.G. testified that there were "like four of them" when he saw J.P. in the time leading up to the altercation. The Tenth District has upheld a conviction where the defendant shot at an attacking group of ten men surrounding him on the basis that the presence of the defendant's friends nearby "plausibly eliminat[ed] the need to use deadly force." *Kendricks* at ¶ 41. Likewise, it would not be unreasonable for a factfinder to believe that the fact that J.P. was not alone and had friends nearby "plausibly eliminated" her need to use deadly force to repel the unarmed attack by N.G. and her friends.

{¶27}  After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we cannot hold that the trial court clearly lost its way and created such a manifest miscarriage of justice that the adjudication must be reversed.

{¶28}  J.P.'s first assignment of error is overruled.

### B. Second Assignment of Error

{¶29}  At trial, J.P. attempted to present a report and testimony from Dr. Jean

Deters, a psychologist, addressing the effect of adolescent brain development on decision-making, as it pertains to J.P.'s actions. The court ruled that the report and testimony would not be admitted at trial to show culpability or whether or not J.P. acted in self-defense.

{¶30} "The admission of evidence is within the sound discretion of the trial court." *State v. Buck*, 2017-Ohio-8242, 100 N.E.3d 118, ¶ 109 (1st Dist.), citing *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 61. Accordingly, we review such a decision for "an abuse of discretion and proof of material prejudice." *Id.*, citing *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 181. An abuse of discretion occurs when the juvenile court's decision is "unreasonable, arbitrary or unconscionable." *Id.*, quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶31} J.P. argues that Deters's expert testimony was necessary to understand J.P.'s actions in the context of a juvenile from an at-risk community. J.P. analogizes the testimony Deters would have presented to evidence regarding battered child syndrome, which is "admissible in Ohio courts when it is relevant and meets the requirements of Evid.R. 702." *State v. Nemeth*, 82 Ohio St.3d 202, 205, 694 N.E.2d 1332 (1998). *Nemeth* also tells us, "Courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met." *Id.* at 207.

{¶32} The state argues that the brain-science evidence that J.P. wanted to include is tantamount to arguing that a juvenile's ongoing brain development prevents a finding of culpability, which is analogous to arguing that the defendant is not guilty by reason of insanity, a defense that is not available in juvenile court. The state argues that the evidence was relevant only for mitigation, but it was not relevant for

adjudication.

**{¶33}** The court refused to admit Dr. Deters's testimony or report. In ruling from the bench, the court stated:

> Okay. So, I'm going to grant the State's motion to preclude or keep out Dr. Deters' testimony and report in the adjudicatory phase of the trial. However, I am going to allow the Defense to argue, if they would like to, about when they are arguing self-defense which, has been stated that that's what's going to happen, if they would like to, about how that applies to their client as a child, to a reasonable child, they can argue about that.
>
> But as far as what Dr. Deters has to offer, I understand – and I understand its importance, but I do think that it is a mitigation issue. It is a why and not an if. And so, that's – if we have an adjudication if you would like to bring her in, we will do that then. Okay.

**{¶34}** Under Evid.R. 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Nemeth*, 82 Ohio St.3d at 207, 694 N.E.2d 1332, quoting Evid.R. 401. Under Evid.R. 702, expert testimony is admissible if all of the following conditions are met:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the

testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

*Id.* at 208, quoting Evid.R. 702.

**{¶35}** In *Nemeth*, the court held that evidence was "clearly relevant" where it "would support a defendant's explanation of the events at issue and would provide evidence as to his possible state of mind at the time of the incident * * *." *Id.* at 207. In *Nemeth*, the court endorsed the use of expert testimony to show whether the defendant: "(1) had acted with prior calculation and design as charged in the indictment, (2) had acted with purpose as required for the lesser included offense of murder, (3) had created the confrontation or initiated the aggression, and (4) had an honest belief that he was in imminent danger, a necessary element in the affirmative defense of self-defense." *Id.*

**{¶36}** In the case at bar, Deters's report covers many topic areas around J.P.'s actions on April 19. In some portions, the report covers material that is not relevant and therefore inadmissible, such as Deters's conclusions based on her own interpretation of events. However, there are other portions that contain relevant, scientific insights that help explain J.P.'s actions and mental processes, including those that influence at least her subjective belief in the need to use force in self-defense.

**{¶37}** Relevant portions of Deters's report include her psychiatric findings: "By the definitions supplied by medical and psychiatric guidelines (ICD-11, DSM-5), [J.P.] met the criteria for what is terrorizing enough to cause a traumatic reaction." Additionally, Deters presents relevant insights based on research into adolescent

psychology:

> Because the brain develops slowly, so does learning to have a long-term perspective. Adolescents often do not plan or do not follow their plans well. They are easily distracted by unanticipated events. Having not thought things out ahead of time, they usually view as 'accidental' the unintended consequences of actions that adults would reasonably predict could have a bad outcome. In [J.P.]'s situation, carrying and even using a weapon did not mean she intended harm. Her plan was simple, to magically protect herself and be back on the school bus the next day.

**{¶38}** Deters's report meets the criteria of Evid.R. 702. The report is helpful to "dispel[] a misconception common among lay persons," namely that children, particularly teenagers, are merely small adults. There is no dispute that Deters has the "specialized knowledge, skill, experience, training, or education" to qualify as an expert, nor that her report is "based on reliable scientific, technical, or other specialized information."

**{¶39}** Rather than evaluate the redacted version of the report that omitted Deters's factual conclusions, the court decided to exclude the report entirely during adjudication. The court refused to hear any evidence regarding child psychology or other brain science that would relate to the difference between juvenile and adult decision-making, particularly noting the circumstances of J.P.'s community, upbringing, and traumatic experiences.

**{¶40}** The juvenile court emphasized that it is already familiar with the sort of material in Deters's report:

And is that knowledge – because I hear what you're saying and I – the literature and those sorts of things are available to the Court and to the public and not necessarily because of her expertise. And so, I'm wondering is – let me think of the best eloquent way to say this. What can she – I don't see anything that [Dr. Deters] can offer to the Court that the Court has not had an opportunity to avail itself to, given the Court's responsibility in this position.

{¶41}   However, the standard for admissibility under Evid.R. 702 does not depend on the knowledge and information that the trier of fact has "had an opportunity to avail itself to." Rather, the standard is whether it "relates to matters beyond the knowledge or experience possessed by *lay persons* or dispels a misconception common among *lay persons*." (Emphasis added.) Evid.R. 702.

{¶42}   Under the circumstances, we hold that the juvenile court abused its discretion by refusing to admit Deters's report insofar as the report contains relevant information useful to understanding such factors as whether J.P. acted with purpose as required for the charged offense of murder, created the confrontation or initiated the aggression, and had an honest belief that she was in imminent danger.

{¶43}   However, we also hold that the error is harmless. "The existence of error does not require a disturbance of the judgment unless the error is materially prejudicial to the complaining party." *Brown v. Burnett*, 2020-Ohio-297, 144 N.E.3d 475, ¶ 57 (2d Dist.), quoting *McQueen v. Goldey*, 20 Ohio App.3d 41, 44, 484 N.E.2d 712 (12th Dist.1984). The juvenile court adjudicated J.P. not guilty of the purposeful-murder charge, which is the charge that is most relevant to the excluded material. And as a juvenile court, the court is already familiar with much of the science around the

15

difference between juvenile and adult decision-making, which reduces the impact of any preconceptions that would be held by lay persons. Consequently, we hold that J.P. did not suffer material prejudice by the exclusion of Deters's report and testimony.

{¶44} J.P.'s second assignment of error is overruled.

### C. Third Assignment of Error

{¶45} In her third assignment of error, J.P. argues that the juvenile court erred in permitting certain evidence to be admitted at trial.

### 1. Prior Fight Video

{¶46} Prior to trial, J.P. filed a motion in limine to exclude a video entitled "prior fight video, before murder." The video contains a snippet of someone stating, "On my daddy, I'll be stabbing hos tonight," while inciting two other girls to fight. N.G.'s mother testified that the voice on the video is J.P. The video goes on to show the fight between the two other girls. N.G.'s mother testified that a close friend of A.G. had sent her the video via Facebook Messenger on the day N.G. died, approximately an hour or two before the final fight between J.P. and N.G. According to N.G.'s mother's testimony, the message accompanying the video stated that the video had been going around social media, and that J.P. and a couple of other girls had been "going around picking and bullying on" other children.

{¶47} At the pretrial hearing on the motion, the state represented that it did not plan to use the video in its case-in-chief, and as a result, the court ruled that J.P.'s motion was moot. However, during the state's cross-examination of N.G.'s mother, the state began to ask questions to lay the foundation for the introduction of the video. Defense counsel objected on multiple grounds. Defense counsel argued that the video was inadmissible because it was not relevant, having been made on a different day

than the fight that ended N.G.'s life; it was unfairly prejudicial character evidence under Evid.R. 404(B); the video was not properly authenticated by someone with knowledge of the circumstances of its creation; and it was a discovery violation because the state did not provide information about how N.G.'s mother came into possession of the video.

{¶48} The state argued that defense had opened the door to the video by putting into question the role that the parents played in encouraging J.P. and N.G. to fight. On direct examination, J.P. introduced text messages between J.P.'s mother and N.G.'s mother. When the state objected to the introduction of the text messages, defense counsel described the purpose: "defense's argument towards self defense also involves parental influence on their children, which would go to their state of mind and to their conversations before and after this happened as well." The court asked counsel to clarify, "whose state of mind?" Defense counsel answered, "Both Ms. [G.] and Ms. [P.] and in regards to their influence on their children as well."

{¶49} The state argued that the video was relevant to rebutting the defense argument of self-defense. According to the state's view, the video is evidence that J.P. wanted to "stab" someone that evening, independent of her mother's encouragement to fight N.G.

{¶50} The court ruled that it would receive the video in the context it was presented, as video that was sent to N.G.'s mother prior to N.G.'s death, showing J.P. encouraging a fight. The court granted the defense motion to exclude the portion of the video title "before murder." The court further ruled that the defense would be free to argue the timing of when the video was created, but that it would affect the weight given to the video, not its admissibility.

{¶51} J.P. first argues that the video was improperly admitted in violation of Evid.R. 404(B).

{¶52} "Evid.R. 404(B)(1) prohibits evidence of a defendant's other acts when its only purpose is to show the defendant's propensity or character to commit crimes." *State v. Glover*, 2023-Ohio-1153, 212 N.E.3d 984, ¶ 41 (1st Dist.). However, under Evid.R. 404(B)(2), other-acts evidence may be admitted for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.*, quoting Evid.R. 404(B)(2). We review the admissibility of other-acts evidence de novo. *Id.*, citing *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22. However, "we review the trial court's weighing of the probative value of admissible evidence against the danger of unfair prejudice to the defendant for an abuse of discretion." *Id.*, citing *Hartman* at ¶ 30.

{¶53} The state argues that the Evid.R. 404(B) analysis does not apply to acts that are a part of the "res gestae" of the crime charged. *See State v. David*, 1st Dist. Hamilton No. C-210227, 2021-Ohio-4004, ¶ 16-19 (explaining the "res gestae" doctrine as allowing evidence of other acts that are "inextricably intertwined and, thus, necessary to give the complete picture of what occurred"). However, this theory is limited to those events that are "contemporaneous" with the charged conduct and necessary to add "meaning and context" to other, relevant testimony. *Id.* at ¶ 19. The res gestae doctrine is inapplicable in this context because the video is not contemporaneous to the charged conduct. Even though the parties disagree whether the video was from April 19 or some earlier date, the fight depicted in the video is clearly some separate event prior to the stabbing. N.G.'s mother testified that she received the video an hour or two before N.G. was stabbed. Consequently, the video

cannot be contemporaneous with the charged conduct in this case.

**{¶54}** In analyzing admissibility under Evid.R. 404(B), "the first step is to determine whether the evidence is relevant to the particular purpose for which it is offered and whether it is relevant to an issue in dispute." *Glover*, 2023-Ohio-1153, 212 N.E.3d 984, at ¶ 42, citing *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 26-27. In this case, the relevance is conditional: if the video depicts events from earlier on the day J.P. stabbed N.G., it would be relevant to showing that J.P. intended to fight N.G., as the state alleged. If the events took place on a different day, as J.P. claims, the relevance is largely attenuated because J.P.'s prediction that she would stab someone that night would pertain to some other situation.

**{¶55}** The state failed to establish that the video was made on the day of N.G.'s death. N.G.'s mother testified that she received the video around 7:00 or 8:00 p.m. on the day of the stabbing. The fight in which J.P. stabbed N.G. took place shortly after 9:00 p.m. The video shows two girls fighting outdoors while J.P. encourages the fight. The outdoor scene is dark, which indicates that the video was made during the nighttime. For the video to have been made on the day of N.G.'s death, it would have had to have been filmed earlier in the day before the stabbing. There was no mention in any testimony about a fight prior to the one that ended N.G.'s life, which would be an extraordinary omission. Because the state failed to establish that the video was created on the same day as the stabbing, the trial court erred in admitting the video.

**{¶56}** However, in "a bench trial, 'we presume that the court considered only "relevant, material and competent evidence" unless the record affirmatively discloses otherwise.' " *Glover*, 2023-Ohio-1153, 212 N.E.3d 984, at ¶ 44, quoting *State v. Pennington*, 1st Dist. Hamilton Nos. C-170199 and C-170200, 2018-Ohio-3640, ¶ 46,

19

quoting *State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987). In reaching its conclusion, the juvenile court made no mention of the prior fight video or J.P.'s statements that she would stab someone. And there is ample evidence to support the court's determination that the state had overcome J.P.'s argument of self-defense without reference to the video. Under these circumstances, the error was harmless.

### 2. Refreshing Recollection

{¶57}   J.P. argues that the juvenile court erred when it permitted the state to refresh C.W.'s recollection by an improper procedure. During the state's direct examination of C.W., the following colloquy took place:

Q. Did [J.P.] say anything to you while you guys were in the car?

A. No.

Q. Okay. Did you hear anything from [J.P.] about a fight?

A. No.

Q. Do you remember giving a statement to police?

A. Yes.

Q. Okay. Now when you gave the statement to police, were you being honest?

A. Yes.

{¶58}   At this point, defense counsel objected to the state's attempt to refresh the witness's recollection. After discussion of the objection, the court ruled that the state could continue its attempt to refresh C.W.'s recollection as long as the proper process was followed:

She has to remember giving a statement. And I need you to ask her if given this – looking at her statement would help her remember or if she

20

– or it would not. Because those are questions that she had to answer before you can show her her own document, otherwise I'm going to grant her the objection.

**{¶59}** The state continued with its examination:

Q. Ms. [W.], do you remember giving a statement to the police?

A. Yes.

Q. Okay. If I showed you that statement, would that refresh your recollection on the events that happened on that night?

A. Yes.

**{¶60}** The prosecuting attorney then showed the witness her statement. The examination continued:

Q. Okay. Now having read this statement, does that refresh your recollection on anything that [J.P.] may have stated?

A. Yes.

Q. Okay. Could you tell us about that?

A. She told –

Q. Who is she?

A. [J.P.] was on the phone with someone, and she was telling whoever she was on the phone with that she was going to beat [N.G.]'s "a," her ass.

Q. Okay. And where is she – where is [J.P.] when she's making these statements?

A. She was walking up the street.

**{¶61}** J.P. objected to the state refreshing C.W.'s recollection because C.W.

never stated that there was something she couldn't remember.

**{¶62}** Evid.R. 612 governs the use of writings to refresh a witness's memory. However, before the trial court permits the witness to use a writing to refresh her recollection, the court must be satisfied that the witness lacks a present recollection of the material. *Dayton v. Combs*, 94 Ohio App.3d 291, 297, 640 N.E.2d 863 (2d Dist.1993). "The propriety of the form of the questions employed to establish this lack of present recollection is largely within the discretion of the trial court." *State v. Henning*, 6th Dist. Wood No. WD-22-046, 2023-Ohio-2905, ¶ 16, citing *Combs* at 297. The witness's lack of present recollection may be express, such as where a witness states that she cannot recall the material, "or it may be apparent from the course of testimony, such as where trial counsel is surprised by the substance of a witness's testimony." Weissenberger & Stephani, *Weissenberger's Ohio Evidence Treatise*, Section 612.3 (2023).

**{¶63}** Here, it is apparent that the prosecuting attorney was surprised that the witness testified that she did not hear anything from J.P. about a fight when she had previously told the police otherwise. Counsel then inquired whether the witness's recollection would be refreshed by reference to her statement to police. The witness then proceeded to testify based on her refreshed recollection, without reading the police statement into evidence.

**{¶64}** "Although the prosecution could have laid a better foundation for the need of refreshing [the witness's] recollection, it is the trial court that must be satisfied that the witness lacks present recollection." *State v. Schrader*, 5th Dist. Coshocton No. 88-CA-19, 1989 Ohio App. LEXIS 888, 8-9 (Feb. 17, 1989). Because it was apparent that the prosecutor was surprised by the substance of the witness's testimony, the

juvenile court did not abuse its discretion by permitting the state to refresh the witness's recollection in this manner.

**{¶65}** J.P.'s third assignment of error is overruled.

### *III. Conclusion*

**{¶66}** We affirm the judgments of the juvenile court.

Judgments affirmed.

**BERGERON** and **WINKLER, JJ.**, concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.